817 F.Supp. 792 (1993)
MARK TWAIN BANK, Plaintiff,
v.
CONTINENTAL BANK, N.A., Defendant.
91-2536C(5).
United States District Court, E.D. Missouri, E.D.
March 31, 1993.
*793 Allen S. Boston, Theodore H. Lucas, Lewis and Rice, St. Louis, MO, for plaintiff.
W. David Wells, Partner, Thompson and Mitchell, St. Louis, MO, William E. Deitrick, Vincent S. Oleszkiewicz, Jeffrey S. Kinsler, Mayer and Brown, Chicago, IL, for defendant.

MEMORANDUM
LIMBAUGH, District Judge.
Plaintiff has filed this diversity action alleging breach of contract and seeking rescission and restoration of all the consideration, plus interest, tendered to the defendant. This matter is before the Court on the plaintiff's motion for summary judgment, filed November 25, 1992. Responsive pleadings have been filed. This case is currently set for trial on the Court's April 19, 1993 trial docket.
Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir.1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir.1988).
Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. *794 Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir.1976). With these principles in mind, the Court turns to an examination of the facts.
The facts of this case are largely undisputed. On December 22, 1989 defendant Continental entered into a Credit Agreement with Townhouse-Penthouse Industries (TPI). Plaintiff's Exhibit 1. The Credit Agreement evidenced the loan of $85,000,000.00 to TPI by Continental and several other financial institutions (hereinafter referred to as Lenders). In addition to being one of the Lenders, Continental acted as the Agent for the Lenders.
On May 22, 1990, plaintiff and defendant entered into a Participation Agreement. Plaintiff's Exhibit 2. Pursuant to the Participation Agreement, plaintiff agreed to purchase a portion ($5,000,000.00) of the $85 million loan to TPI. In consideration for plaintiff's agreement to purchase a portion of the loan to TPI, defendant Continental agreed that when TPI made its scheduled repayments to Continental, Continental would remit a certain percentage to Mark Twain.
Under the terms of the Credit Agreement, TPI was obligated to make certain principal payments by September 30, 1991, December 31, 1991, and March 31, 1992. TPI was also obligated to make certain interest payments by September 18 and 30, 1991. All loan payments had to be made by December 29, 1995.
Due to financial difficulties, TPI failed to make its September payments. Continental requested that Mark Twain consent to an extension of these payments until July 1, 1992. Mark Twain refused to consent to the extension of time to make the payments. Affidavit of Ronald T. Barnes. On October 16, 1991, at the request of the Lenders, defendant Continental sent TPI a notice of default and declared an acceleration of TPI's loans.
On October 23, 1991 Continental rescinded the notice of default. TPI had asked for a restructuring of its loans and the Lenders had agreed that a restructuring was desirable. The Lenders and TPI then entered into a Waiver and Amendment Agreement by which TPI's term loan payments were deferred until July 1, 1992; the revolving loan payments were deferred until November 22, 1991 and July 1, 1992. TPI still remained obligated to make all outstanding loan payments by December 29, 1995.
As of today's date, TPI has failed to make its July 1, 1992 payments or its December 14, 1992 payment.
In its motion for summary judgment, plaintiff contends that defendant has materially breached the Participation Agreement. Plaintiff avers that defendant has violated Section 11 of the Participation Agreement by rescinding the notice of default and entering into the Waiver and Amendment Agreement with TPI in which the final maturity date for TPI's loans has been extended without plaintiff's consent or in lieu of plaintiff's refusal to consent, without repurchasing plaintiff's participation interest in the loans to TPI. Defendant contends that since the "Stated Maturity Date" of December 29, 1995 remained the same, no consent was required of plaintiff, and therefore there was no breach of the Participation Agreement.
The issue that is disputed by the parties concerns the interpretation of the phrase "final maturity". Plaintiff argues that "final maturity" and "Stated Maturity Date" are not ambiguous terms referring to different *795 dates, but that both phrases have one meaning covering two factual situations. Plaintiff contends that final maturity/stated maturity date refers to the date on which the unpaid principal balance and unpaid accrued interest become unconditionally due and payable and that this date is set down either as a result of default and acceleration or as a result of the passage of time. As a result of defendant's October 16, 1991 letter and the definition of "Stated Maturity Date" in Sections 1.1 and 8.3 of the Credit Agreement, the final maturity date of the loans covered by the Credit Agreement became no later than October 16, 1991. By rescinding the notice of default (i.e. the letter of October 23, 1991) and entering into the Waiver and Amendment Agreement with TPI whereby the final maturity date was extended to December 29, 1995, plaintiff believes that defendant breached Section 11 of the Participation Agreement. Plaintiff contends that it would not have entered into the Participation Agreement with defendant if it were not for the safeguards provided in Section 11 whereby plaintiff avers that its consent is required before extending the final maturity date of any loans to TPI, otherwise, defendant must repurchase plaintiff's participation interest.
Defendant argues that the term "final maturity" is undefined in both the Credit Agreement and the Participation Agreement, while the term "Stated Maturity Date" is a term used and defined only in the Credit Agreement. Defendant contends that the terms at issue have different meanings under the Agreements. Defendant further contends that it is a question of fact as to whether or not a breach of Section 11(b) of the Participation Agreement is "material", therefore summary judgment is inappropriate.
Before embarking upon an analysis of the arguments set forth in the parties' pleadings, the Court must first address defendant's point regarding the appropriateness of summary judgment as a tool for resolution of this matter. The Court agrees that under most circumstances, the "materiality" of a breach (of a contract) would be a question left to the jury to decide. However, this is a nonjury case. This Court is not only the final authority on questions of law, but also serves as the factfinder in this case. Consequently, all questions of law and fact will be determined by this Court either by summary judgment or at trial.
As stated before, central to plaintiff's summary judgment motion is whether or not Continental extended the "final maturity" of the loans to TPI, as that term is used and understood in Section 11(b) of the Participation Agreement. Plaintiff argues that the term "final maturity" is synonymous with the term "Stated Maturity Date" as that term is defined in the Credit Agreement. Defendant totally disagrees.
The term "Stated Maturity Date" is defined in Section 1.1. of the Credit Agreement as follows:
SECTION 1.1. Defined Terms. The following terms (whether or not underscored) when used in this Agreement, including its preamble and recitals, shall, except where the context otherwise requires, have the following meanings (such meanings to be equally applicable to the singular and plural forms thereof):
"Stated Maturity Date" means (subject to the terms of Section 8.2 and Section 8.3)
(a) in the case of any Revolving Loan, December 29, 1995; and
(b) in the case of any Term Loan, December 29, 1995.
Section 8.2 of the Credit Agreement provides what action occurs under the loan in case of TPI's bankruptcy. Section 8.3 of the Credit Agreement governs the actions if there are events of default by TPI, other than by bankruptcy:
SECTION 8.3. Action if Other Event of Default. If any Event of Default (other than any Event of Default described in clauses (a) through (d) of Section 8.1.9 with respect to the Borrower or any Subsidiary or any other Obligor) shall occur for any reason, whether voluntary or involuntary, and be continuing, the Agent, upon the direction of the Required Lenders, shall by notice to the Borrower declare all or any portion of the outstanding principal amount of the Loans and other Obligations to be due and payable and/or the Committments (if not theretofore terminated) to be *796 terminated, whereupon the full unpaid amount of such Loans and other Obligations which shall be so declared due and payable shall be and become immediately due and payable, without further notice, demand, or presentment, and/or, as the case may be, the Committments shall terminate.
Section 10.1 addresses waivers, amendments, and/or modifications to the Credit Agreement and states in pertinent part:
SECTION 10.1. Waivers, Amendments, etc. The provisions of this Agreement and of each other Loan Document may from time to time be amended, modified, or waived, if such amendment, modification or waiver is in writing and consented to by the Borrower and the Required Lenders[1]; provided, however, that no such amendment, modification or waiver which would: (c) extend the due date for, or reduce the amount of, any scheduled repayment or prepayment of principal of or interest on any Loan (or reduce the principal amount of or rate of interest on any Loan) shall be made without the consent of the holder of that Note evidencing such Loan;
Although the term "final maturity" is not defined either in the Credit Agreement or the Participation Agreement, it is used in Section 10.11(g) of the Credit Agreement as follows:
SECTION 10.11. Assignments and Participations. Assignments by Lenders of, and the granting of participations in, their rights and obligations arising under and with respect to this Agreement shall be permitted as follows:
(g) On or after the Secondary Syndication Date, each Lender may sell participations to one or more eligible participants in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Assignable Committments, Assignable Advances, and either of the Notes held by it): provided, however, that
(v) any participant which is not an affiliate of such Lender shall have no right to require such Lender to take or omit to take any action under this Agreement or any Note, except actions described in Item 10, and action extending the final maturity of any Loan, reducing the interest rate, fees or commissions on, any Loans in which such participation was sold, or forgiving any principal of or interest, fees, or commissions payable on any Loans in which such participation was sold. Each Lender agrees to incorporate the requirements set forth in the preceding sentence into each participation agreement which such Lender enters into with any participant.
As stated before the term "final maturity" is not defined in either the Credit Agreement or the Participation Agreement; however, the Participation Agreement clearly states (as part of its Preliminary Statement):
"Unless the context clearly indicates otherwise, all terms used in this Agreement shall have the meanings given them by, and shall be construed as set forth in, the Credit Agreement notwithstanding any termination thereof."
Section 11 of the Participation Agreement defines the relationship between the plaintiff and the defendant. Section 11(a) reads in pertinent part:
SECTION 11. Action by the Bank.[2]
(a) The Participant expressly understands and agrees that (A) the Bank may use its discretion with respect to exercising or refraining from exercising any rights which it may have or taking or refraining from taking any actions it may be entitled to take in connection with the Loans, any Note, the Credit Agreement or any other document related to the Loans or any collateral therefor or any obligor thereunder; (B) in exercising such discretion, the Bank will use the same care to protect the interest of the Participant as it does to protect *797 its own, and that, so long as the Bank exercises such care, it shall not be under any liability to the participant except in the instance of the Bank's gross negligence or willful misconduct (without limiting the foregoing the Bank may consult with legal counsel, independant public accountants, and experts selected by it, and will not be liable for any action that it takes or does not take, in good faith, in accordance with the advice of such counsel, accountants or expert, and the Bank may act in reliance on any notice, consent or other instrument which it believes to be genuine). The Participant further expressly understands and agrees that the Bank may, in its sole discretion in each instance, without prior notice to or consent of the Participant agree to any amendment, modification, waiver, release or consent with respect to the Notes, Credit Agreement or any document (including, without limitation, any security agreement or guaranty) relative to the Loans, or take, or refrain from taking, any with respect thereto, except that the Bank will not, without the consent of the Participant, agree to any action described in Section 11(b) hereof. If the Bank requests the Participant's consent to such an amendment, modification, waiver, release or consent and the Participant does not respond within five (5) days of the Bank's written request, the Participant shall be deemed to have given its consent thereto. If the Participant is unwilling to consent to any amendment, modification, waiver, release or consent which requires its consent, the Bank shall have the right, but not the obligation, to repurchase the Participant's Participation in all of the Loans or, in its discretion, in only the Loans under the facility affected by such change ...
Section 11(b) incorporates Section 10.11(g) and reads as follows:
(b) Pursuant to Section 10.11(g) of the Credit Agreement, the parties hereto agree that (i) the Bank's obligations under the Credit Agreement (including its Committments to the Borrower) shall remain unchanged; (ii) the Bank shall remain solely responsible to the other parties for the performance of such obligations; (iii) the Bank shall remain the holder of any Note or Notes for all purposes of the Credit Agreement; (iv) the Borrower, the Agent and the other Lenders shall continue to deal solely and directly with the Bank in connection with the Bank's rights and obligations under the Credit Agreement; (v) any participant which is not an affiliate of the Bank shall have no right to require the Bank to take or omit to take any action under the Credit Agreement or any Note, except actions described in Item 10 of the Credit Agreement, and action extending the final maturity of any Loan, reducing the interest rate, fees or commissions on, any Loans in which such participation was sold, or forgiving any principal of or interest, fees or commissions payable on any Loans in which such participation was sold.
Under Illinois law[3] the primary objective when reviewing a disputed contract or certain terms is to give effect to the intent of the parties by viewing the language of the contract as a whole. Wikoff v. Vandeveld, 897 F.2d 232, 238 (7th Cir.1990) citing Braeside Realty Trust Co. v. Cimino, 479 N.E.2d 1031, 1033 (1985). The starting point is to look at the entire contract's language (not just the disputed provisions) and determine whether or not the language is ambiguous. This first determination is a question of law for a court to decide. If a court determines that the language is unambiguous, then the court must declare the contract's meaning. This too is a question of law for the court. If the court determines the language to be ambiguous, then it becomes a question of fact for the trier-of-fact.[4]Metalex Corp. v. Uniden Corp. of America, 863 F.2d 1331, 1333 *798 (7th Cir.1988); LaSalle National Bank v. Service Merchandise Co., 827 F.2d 74, 78 (7th Cir.1987); Cagen v. Intervest Midwest Real Estate Corp., 774 F.Supp. 1089, 1095 (N.D.Ill.1991).
A contract is ambiguous under Illinois law only if it is "reasonably and fairly susceptible to more than one meaning." Metalex, at 1334, citing Lenzi v. Morkin, 116 Ill. App.3d 1014, 72 Ill.Dec. 414, 416, 452 N.E.2d. 667, 669 (1st Dist.1983), aff'd, 103 Ill.2d 290, 82 Ill.Dec. 644, 469 N.E.2d 178 (1984); Cagan, at 1095; Newman-Green, Inc. v. Alfonzo-Larrain R., 612 F.Supp. 1434, 1437 (D.Ill. 1985). However, ambiguity is not established by mere disagreement of the parties as to the contract's meaning or the proper interpretation of one or more of its terms. Cagan, at 1095; Newman-Green, at 1437.
The first step in contract interpretation, under Illinois law, is application of the "four corners test" or the "plain meaning test". Metalex, at 1335. A written agreement is "presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used." Metalex, at 1335 quoting Western Illinois Oil Co. v. Thompson, 26 Ill.2d 287, 186 N.E.2d 285, 287 (1962). The court should give the language its plain meaning and effect. Paist v. Town & Country Corp., 772 F.Supp. 412, 414 (N.D.Ill.1991). "When ascertaining intent, the court may construe the words used in the contract according to their `ordinary, natural and commonly accepted meaning unless it clearly appears that the parties intended to ascribe to them a peculiar or unusual meaning.'" First Commodity Traders v. Heinold Commodities, 766 F.2d 1007, 1014 (7th Cir.1985) [quoting First National Bank of LaGrange v. Mid-States Engineering & Sales, 103 Ill.App.3d 572, 59 Ill.Dec. 295, 431 N.E.2d 1052, 1053 (1981)]; see also, Harry F. Chaddick Realty v. Maisel, 762 F.2d 534, 537 (7th Cir.1985). If a court determines that the contract language is ambiguous, then the court may consider extrinsic or parol evidence to clarify an otherwise ambiguous contract term. Paist, 772 F.Supp. at 414.
If the contract is ambiguous and the extrinsic evidence is undisputed, then the contract interpretation remains a question of law for the court to decide. However, if the extrinsic evidence is disputed, then the trier-of-fact (which in the instant case is this Court) must determine the intent of the parties. Lumpkin v. Envirodyne Industries, 933 F.2d 449, 456 (7th Cir.1991); Wikoff, at 238.
Plaintiff contends that the term "final maturity" as used in Section 11(b) of the Participation Agreement is synonymous with the term "Stated Maturity Date" as defined in the Credit Agreement. It argues that by extending the interim principal and interest payment dates to July 1, 1992 and the "final maturity" of all loans to TPI from October 16, 1991 to December 29, 1995 (by virtue of the October 23rd letter of recission and the subsequent execution of the Waiver and Agreement), without Mark Twain's consent, and without repurchasing Mark Twain's participation agreement, the defendant has materially breached Section 11(b) of the Participation Agreement and thus plaintiff is entitled to rescission. Defendant counters that Section 11(b) only gave plaintiff the right to consent to extension of the "final maturity" date, i.e. December 29, 1995; it did not give plaintiff the right to consent to extensions of the "Stated Maturity Date" as that term is defined in Section 1.1 of the Credit Agreement.
As a matter of law, Section 11(b) of the Participation Agreement is ambiguous on its face because the term "final maturity" is not specifically defined in this clause or anywhere in the Agreement. The Participation Agreement not only fails to define "final maturity" but also fails to associate any specific date (whether that date be December 29, 1995 or otherwise) to the term. Therefore, it is necessary to go beyond the language contained in the Participation Agreement and define the parties' intent by looking to extrinsic and parol evidence.
The Participation Agreement clearly states that its terms shall be defined by and construed in conjunction with the Credit Agreement. *799 See, Preliminary Statement of the Participation Agreement.
Plaintiff claims that the "Stated Maturity Date" and the "final maturity" date are one and the same with the same ramifications regarding the two agreements. The Court disagrees.
Section 1.1. of the Credit Agreement provides that the "Stated Maturity Date" for all the loans, as of the date of the Credit Agreement, was December 29, 1995. However, as the "Stated Maturity Date", December 29, 1995 was subject to change pursuant to Sections 8.2 and 8.3 of the Credit Agreement. For present purposes, only Section 8.3 is relevant. Section 8.3 provides for the defendant, upon the direction of the Lenders, to declare a default, to accelerate the loans, and to declare all or any portion of the loans to be due and payable. It does not state anything about the plaintiff's (as a Participant) consent being required. In fact, plaintiff concedes this point in its Response to Defendant's Second Request for Admissions. Defendant's Exhibit C. Consequently, the "Stated Maturity Date" whether it be December 29, 1995 or any other date was subject to change without consent by the plaintiff.
Defendant concedes, however, that pursuant to the Credit Agreement and the Participation Agreement, December 29, 1995 as the "final maturity" date for all the loans was not subject to change without the plaintiff's consent. Section 10.11(g), subsection (v) clearly provides three instances wherein the plaintiff's consent was required: 1) to extend the final maturity of any loan; 2) to reduce the interest rate, fees or commissions on the loan subject to the Participation Agreement between plaintiff and defendant; and 3) to forgive any principal and/or interest payments payable on the loan subject to the Participation Agreement between plaintiff and defendant. Section 10.11(g), subsection (v) is repeated in Section 11 of the Participation Agreement. Section 11(a) of the Participation Agreement provides that the Bank (defendant) may agree to any amendment, modification, waiver or release of the Credit Agreement without the consent of the Participant (plaintiff) except for the circumstances described in Section 11(b) of the Participation Agreement. Section 11(b) then repeats the same three instances in which plaintiff's consent is required as stated in Section 10.11(g), subsection (v) of the Credit Agreement. Consequently, the "final maturity" date, which also happened to be December 29, 1995 was not subject to change without the plaintiff's consent.
Finally, Section 10.1 provides that the Credit Agreement may be amended, modified, or waived by consent of the Borrower and the Required Lenders. There is no mention of consent being required by a Participant.
As the "Stated Maturity Date" under the Credit Agreement, December 29, 1995 was subject to change due to default, defendant could declare the default, accelerate the loan payments, and declare them due and payable without the plaintiff's consent. Furthermore, defendant could rescind the notice of default by virtue of amending or modifying the Credit Agreement without plaintiff's consent. The only thing defendant could not do, pursuant to the Credit Agreement and the Participation Agreement, is change the final maturity date, i.e. the absolute last date upon which all the loans were payable, without plaintiff's consent. This it did not do. The final maturity date remains December 29, 1995.
Plaintiff attempts to support a different interpretation of the term "final maturity" by submitting the affidavit of Ronald Barnes, Group President of Mark Twain Banks. Barnes' affidavit states that Mark Twain Bank would not have entered into the Participation Agreement with defendant if Section 11 had not required plaintiff's consent before "extending interim principal and interest payment dates and/or the final maturity of any loan to TPI." Barnes Affidavit, pg. 3.
Mr. Barnes' affidavit is meaningless in the context of the present contract construction dispute. The affidavit fails to educate the Court as to how Mr. Barnes reached the "understanding" that Mark Twain's consent was required before Continental could extend the interim principal and interest payments *800 and/or the final maturity of the loans to TPI. Mr. Barnes does not state that this "understanding" was ever conveyed to Continental. Defendant submits the affidavit of Laurel Sanford, Managing Director in Continental Bank's Distribution, Metro, and Private Banking Department. Defendant's Exhibit D. She states that she was involved in negotiating both the Credit and Participation Agreements. She further states that she had several conversations with plaintiff's representatives in connection with the Participation Agreement and that "[n]o representative or agent of Mark Twain Bank ever indicated to me that Mark Twain Bank would not enter the Participation Agreement if Mark Twain did not have the right to consent to Continental's extension of any interim principal and interest payment dates and/or the Stated Maturity Date or final maturity date of any loan to TPI under the Credit Agreement." Sanford Affidavit, pg. 3.
Mark Twain's subjective intent that it would not have entered into the Participation Agreement if it did not have the expansive veto power it now claims to have been deprived of is immaterial if it was not disclosed to Continental. See, Metalex, at 1334. There is nothing in either of the Agreements to support Mark Twain's interpretation of Section 11(b) of the Participation Agreement nor does Mark Twain offer any objective evidence to support Mr. Barnes' affidavit as to the plaintiff's understanding of the rights and obligations of the parties.
Plaintiff further contends that Section 11 of the Participation Agreement mandates that if Continental chose to extend the interim loan payments and change the "final maturity" date of the loan subject to the Participation Agreement without Mark Twain's consent, then Continental had to repurchase Mark Twain's participation interest in the loan to TPI. The Court disagrees with this reading of Section 11.
Under Section 11(a) of the Participation Agreement, if Mark Twain "is unwilling to consent to any amendment, modification, waiver, release or consent which requires its consent, the Bank shall have the right, but not the obligation, to repurchase the Participant's Participation in all of the Loans or, in its discretion, in only the Loans under the facility affected by such change, at such time for a purchase price equal to the Participant's Percentage share of the then unpaid principal balance of the Loans being repurchased (with interest and commitment fees accrued to the date of such repurchase being payable to the Participant as if such repurchase had not occurred) and terminate the Participant's obligations hereunder with respect to the repurchased Loans." (emphasis added).
The contract language is clear that Continental was not required to repurchase Mark Twain's participation interest in lieu of Mark Twain's consent. Even assuming arguendo that Continental needed Mark Twain's consent to modify the Credit Agreement and extend the interim loan payments or to change the "final maturity" date as interpreted by Mark Twain, and chose to do either without Mark Twain's consent, Continental was not then required to repurchase Mark Twain's participation interest. Section 11 bestows a "right of repurchase" upon Continental, not an "obligation of repurchase". Such language makes a decision by Continental to repurchase Mark Twain's participation interest (under Mark Twain's scenario) a purely voluntary one.
The Court finds that plaintiff's consent was not required to 1) declare the TPI loans in default and accelerate the loan payments; 2) rescind the notice of default; and 3) enter into a Waiver and Agreement whereby only the interim loan payment dates were changed and not the final date upon which all loans had to be repaid. The Court further finds that pursuant to the language contained in the Credit Agreement and the Participation Agreement and under the principles of contract construction law in Illinois, defendant Continental, by its actions, changed only the "Stated Maturity Date" of the TPI loans (which did not required plaintiffs consent) and did not alter the "final maturity" date of the TPI loans. The Court further finds that under the express terms of the Participation Agreement Continental was not required to repurchase Mark Twain's participation interest. Finally, the Court finds that defendant Continental did not materially breach Section *801 11 of the Participation Agreement by its actions.
This case is remarkably similar to the case of First National Bank of Louisville v. Continental Bank, N.A., 933 F.2d 466 (7th Cir. 1991). In the Louisville case, five banks (including the parties) entered into a loan agreement in which a $60 million loan was made to Prime Leasing, a computer leasing firm.[5] Continental (once again) was appointed the agent for the banks. It was to administer the loan. The loan was only for one year, but could be extended on a year-to-year basis if all the banks agreed. November 12, 1988 was designated the "conversion date", i.e. if the loan had not been extended by then, the unpaid principal remaining in the revolving-credit account at the end of the year would be converted to a nonrevolving three year loan. Id., at 468.
In June 1988 Prime Leasing defaulted on the loan. The loan agreement stated that in the event of default, Continental could, at the request of a majority of the banks, call the loan and the promissory notes would become due and payable immediately. Id., at 468. No such request was made by a majority of the banks, thus the loan continued. Continental, however, over First National's objections, released Prime Leasing's collateral from the freeze that went into effect when Prime Leasing defaulted and to subordinate the collateral to outside lenders so that Prime Leasing could continue in business. Id., at 468.
As November 12, 1988 approached there was concern over what to do about the loan to Prime Leasing. It was decided to amend the terms of the original loan. In September 1988 all the banks, except First National, signed an amendment to the loan. The amendment waived Prime Leasing's default and eliminated the conversion date of November 12, 1988. Id., at 468. In May 1989 First National filed suit against Continental claiming that Continental, in collusion with the other banks, had breached the terms of the loan agreement. Id., at 468.
The Seventh Circuit Court of Appeals found that there had been a technical breach of the loan agreement when the amendatory agreement was entered into without First National's consent. However, this breach caused no harm to First National because the amendment was thus a nullity and the conversion date remained the same. Id., at 469. Judge Posner goes on to state that contrary to First National's assertion, Continental was not required to declare a default and call the loan prior to the conversion date without a majority consent. Since Continental controlled the collateral, First National could not collect on its note in the event that Prime Leasing defaulted prior to November 12, 1988. In essence, First National was subject to "majority rule" until the conversion date. Id., at 469-70.
Judge Posner went on to point out that First National's interpretation of the terms of the loan agreement would have put it at an advantage over the other banks involved in the loan arrangement.
"The banks that had financed five-sixths of the loan thought it in their best interest not to call the loan, despite the borrower's default. Given that decision, it was in First National's interest to play dog in the manger, since while Prime obviously could not have paid back the entire loan on November 12, 1988, it might well have been able to turn over assets worth $10 million, had Continental not controlled the assets. But that depletion of Prime's assets might have jeopardized its survival, to the prejudice of the remaining lenders. Had First National called its loan, this might well have precipitated Prime into bankruptcy, in which event all the banks would probably have been losers. First National didn't want to take that chance. It is asking for an interpretation of the agreement that not only lacks textual support, *802 but also arms one bank to take advantage of the forbearance of others. The agreement, it bears emphasis, authorized First National to call its loan when at year's end Prime was in default, but it did not authorize First National to take advantage of the other banks as it seeks to do, and thus enjoy the best of all possible worlds."
Id., at 470.
In the present case, Mark Twain seeks an interpretation which "arms one bank to take advantage of the forbearance of others." Its interpretation of Section 11 of the Participation Agreement would allow it to unilaterally force Continental to declare TPI in default and accelerate the loans, possibly putting TPI into bankruptcy. This "veto" power that Mark Twain claims it possesses would be extremely detrimental to the Lenders by undermining the very heart of the Credit Agreement. It would be ludicrous for one Participant with a $5 million share of the $85 million loan to be able to jeopardize the interests of the Lenders (of the remaining $80 million) as Mark Twain proposes. Although the factual situation differs, the underlying principles and logic of Judge Posner is applicable to the present case. As a minority shareholder in the loans made to TPI, plaintiff's protection is in the final repayment of the loans by December 29, 1995. It has no power to override the decisions of the Lenders nor to unilaterally force TPI into probable bankruptcy to the detriment of the Lenders. Mark Twain complains that its risk has been increased due to the extensions of the payment dates. The Court disagrees. Plaintiff's risk in entering into the Participation Agreement was not being fully repaid by December 29, 1995. This risk remains the same.
The Court agrees that it appears that TPI is in financial trouble and may not be able to repay in full all the loans by December 29, 1995. However, under the terms of the Credit Agreement and the Participation Agreement, plaintiff must abide by the decisions of the Lenders and/or Continental unless Continental chooses to forgive any of the principal and/or interest payments payable on the loan subject to the Participation Agreement, reduce the interest rate on the loan subject to the Participation Agreement, or change December 29, 1995 as the final and last date upon which all loans to TPI must be repaid in full. For now, none of these situations has taken place. Plaintiff may regret its decision to enter into the Participation Agreement but it must live with its decision barring any other "breach" it feels has occurred or a change in circumstances allowing it to be relieved of its involvement with this troubled loan.
Having found no breach, material or otherwise, of Section 11 of the Participation Agreement, plaintiff's motion for summary judgment shall be denied.

ORDER
In accordance with the memorandum filed herein this day,
IT IS HEREBY ORDERED that plaintiff's motion for summary judgment, filed November 25, 1993, be and is DENIED. Judgment is entered for defendant and against the plaintiff on the issue of a material breach of contract due to alleged violation of Section 11 of the Participation Agreement. This cause remains on the Court's trial docket of April 19, 1993.
NOTES
[1] The Required Lenders are the defendant as well as the other financial institutions that entered into the Credit Agreement with TPI and provided the $85 million loan. Plaintiff Mark Twain Bank is not one of the Required Lenders.
[2] For purposes of the Participation Agreement, the "Bank" refers to defendant Continental and "Participant" refers to plaintiff Mark Twain Bank.
[3] The parties agree and the Court concurs that pursuant to the Agreements, the substantive law of Illinois regarding contract construction is controlling.
[4] Normally, the trier-of-fact would be a jury, therefore the ambiguity of the contract language would be an issue for trial, thus summary judgment would be inappropriate. However, in the instant case, the trier-of-fact is this Court, therefore disposition by summary judgment would be permissible.
[5] This case, as noted by Judge Posner, is slightly different from the usual joint lending situation evidenced by a loan agreement by one or more banks with the borrower and separate participation agreements with other banks in which the "lead bank" sells shares in the loan(s). In the Louisville case, all the banks signed the loan agreement with the borrower and separate promissory notes were issued, plus a separate agreement was entered into by the banks only in which Continental's duties as the "agent" were set forth. However, Judge Posner noted that for "simplicity's sake", the two agreements were being treated as one, i.e. the loan agreement.