A.J. CUNNINGHAM PACKING CORP.,
Plaintiff, Appellee,

v.

The FLORENCE BEEF CO.,
Defendant, Appellant.

No. 85–1344.

United States Court of Appeals,
First Circuit.

Argued Oct. 9, 1985.

Decided March 5, 1986.

See also 529 F.Supp. 515.

John A. Donovan, Jr. with whom Thomas D. Burns, Michael B. Weinberg and Burns & Levinson, Boston, Mass., were on brief, for defendant, appellant.

Arnold E. Cohen with whom Englander, Englander & Finks, P.C., Boston, Mass., was on brief, for plaintiff, appellee.

Before COFFIN and BREYER, Circuit Judges, and HILL,[*] District Judge.

IRVING HILL, Senior District Judge.

A quarter-century ago, Judge Friendly confronted the question of "what is a chicken". *Frigaliment Importing Co. v. B.N.S. International Sales Corp.*, 190 F.Supp. 116 (S.D.N.Y.1960). Today we are asked to review a case in which the jury had to confront the meatier issue of "what's the beef".

Plaintiff/Appellee A.J. Cunningham Packing Corp. ("Cunningham") sued Defendant/Appellant The Florence Beef Co. ("Florence") for breach of contract. Cunningham, the seller, alleged that Florence, the buyer, wrongfully rejected a shipment

[*] Of the Central District of California, sitting by designation.

of four loads of Australian boneless beef, which Florence had ordered on December 28, 1979. Both sides agree that the contract required the beef to be "85% chemically lean". Florence rejected the beef claiming it failed to meet that requirement.

The case was tried to a jury, which returned a verdict for Cunningham with damages set at $50,457.38. The court entered judgment in that amount. Shortly thereafter, the court denied Florence's alternative motion for judgment n.o.v. or a new trial.

Florence appeals from both the judgment and the court's denial of its alternative motion. Florence advances three claims of error, all involving rulings on evidence. They are: (1) the court's exclusion of evidence offered by Florence that related to the concept of "visual leanness"; (2) the court's exclusion of testimony from Florence's meat industry expert about trade usage; and, (3) the court's apparent invocation of the parol evidence rule to justify the exclusion of certain evidence.

## BACKGROUND

In a telephone conversation on December 28, 1979, Cunningham agreed to sell, and Florence agreed to buy, four loads of Australian boneless beef, guaranteed to be 85% "chemical lean". The same day, Cunningham sent to Florence four separate but identical Sales Confirmation Orders, one for each of the four loads. Florence signed and dated each order on January 10, 1980, and returned them to Cunningham. On the front of each order, the words **"THIS ORDER SUBJECT TO CONDITIONS OF SALE ON FACE AND REVERSE SIDE HEREOF"** appear. On the reverse side, under the "Conditions of Sale", item number 4 provides in relevant part that:

In the event Buyer claims product covered by this contract is less than the chemical leanness specified in this contract,

Seller has the right to arrange independent testing. Should the product test less than the guaranteed chemical leanness, Seller will allow for excessive fat content based on selling price, and Buyer will accept such as *full settlement.* (emphasis added).

Between December 28, 1979, when the beef was ordered, and the date when the beef was received, the record indicates the price of beef had fallen and it continued to fall until Florence unequivocally rejected the shipments.

Shortly after receiving the four loads, Florence had a laboratory test them for chemical leanness. The results showed the loads to be 83.86%, 81.54%, 81.74% and 80.96% chemical lean, respectively. Florence notified Cunningham of the test results on January 28, 1980.

What happened next is disputed, but the parties do agree that the four loads were subsequently tested again by two different laboratories, and the averaged results showed them to be 84.7%, 83.25%, 83.6% and 83.5% chemical lean. The parties accept these averaged figures as correct.

Based on those figures, Cunningham recognized that the beef delivered did not fully satisfy the contract requirement of 85% chemical lean. Mr. Knight, who was Cunningham's operations manager at the time, testified that it was the customary practice between these parties, as well as a custom in the trade, that when a buyer's claim that meat does not satisfy the contract specifications is verified by testing, the seller reduces the purchase price. The amount of the reduction, as well as the circumstances under which the buyer must accept such a reduction rather than reject the beef, are set forth in "Guidelines for the Settlement of Fat Claims", a publication promulgated by the Meat Importers Council of America.[1]

---

1. The Guidelines, which the trial court allowed in to evidence, provide in relevant part:

"These guidelines shall apply to *all* meat sold on a guarantee chemical lean basis.

\*    \*    \*    \*    \*    \*

6.2 "When beef or veal is guaranteed ... 85% chemical lean, a tolerance of one-half of 1% will be permitted to allow for possible variations in sampling and analysis. Therefore, ... 84.5% chemical lean [is] considered [a] good deliver[y]. However, if below [that] percentage,

After confirming the test results, Cunningham notified Florence that it would credit Florence's account for the required price adjustments. The parties agree that, if the Guidelines govern the transaction, Florence was not allowed to reject any part of the shipment and Cunningham made proper price adjustments, as the Guidelines required.

After further delay, (the cause and significance of which the parties dispute) Florence, in April 1980, unequivocally rejected the beef, and Cunningham ultimately resold the beef to various buyers at a loss.

We now take up each ground of appeal in turn.

## (1) VISUAL LEAN

When the beef arrived from Australia, it was contained in cartons which bore the letters "BCVL" without further explanation as to their meaning or significance. Florence contends that those letters were a representation about the quality of the beef in terms of *visual* leanness; namely, that the letters "BCVL" mean the beef packed in the boxes is 87.5% visual lean, and that 87.5% visual lean equals 82.5% chemical lean. Building from that contention, Florence goes on to claim that it was entitled to reject all the beef delivered because of the BCVL markings and what they mean.

Florence hoped to show that there is a custom in the trade that the Guidelines with their permissible price adjustments do not apply if the seller knowingly sent meat which did not fulfill the 85% chemical lean standard specified by the buyer. Since "BCVL" is allegedly a standard which, when transmuted into chemical leanness is below 85% chemical leanness, Florence contends that the Australian shipper knew that the meat it was shipping would not satisfy the 85% standard. Thus Florence, according to this theory, was justified in

rejecting the meat it received in boxes marked "BCVL".

Some of the evidence offered by Florence to support this theory is contained in offers of proof from several witnesses. On many occasions the court sustained objections to testimony along these lines. The trial judge appears to have rejected the offered evidence on the essential ground that it was irrelevant, and, if admitted, would tend to confuse the jury.

We note that the admission or exclusion of evidence is within the sound discretion of the trial court, *Harrington v. United States,* 504 F.2d 1306 (1st Cir.1974), and the court's determination will not be reversed on appeal unless an abuse of discretion is shown. *United States v. Coast of Maine Lobster Co.,* 557 F.2d 905 (1st Cir. 1977).

■ Applying the above standards, we conclude that the trial judge's rejection of the offered testimony, in each instance, was within the court's sound discretion and does not constitute reversible error. As concerns the marking "BCVL", the evidence was uncontradicted that such marking was not officially registered with any governmental authority in Australia or the United States until after this shipment was made and this dispute arose. Thus, the argument that these markings constituted a representation of any kind on which a buyer could rely, is very weak.

Moreover, if "BCVL" represents anything, it is, as Florence concedes, the grade of *visual* leanness, made at the shipment's point of origin. There was absolutely no foundation for the proposition that visual lean percentages can accurately be converted to chemical lean percentages. Indeed, after carefully reviewing the entire record, including all of Florence's offers of proof, we can find no evidence that would have established such a link. Chemical leanness is based on a scientific test that can be

---

there shall be an allowance equal to each proportionate percentage thereof by which the product falls below ... 85%, with additional penalties as follows when analysis is below ... 83%.

\* \* \* \* \* \*

*Below 80% the sale is to be considered cancelled* and the funds returned or price renegotiated. (emphasis added).

done only after the beef is frozen. The best that can be said about visual lean ratings is that they are an inspector's initial "guesstimate" of the fat content, based on visual inspection before freezing. And, depending on the inspector's experience and ability, visual lean percentages may turn out to be between three and seven percentage points higher than what the chemical tests ultimately show.

Therefore, the trial court, which was dealing with a contract of sale admittedly based on chemical leanness only, was well within its discretion in rejecting as irrelevant all of the offered evidence as to visual leanness and the meaning of the letters "BCVL".

## (2) EXCLUSION OF EXPERT TESTIMONY

Florence also assigns as error the trial court's exclusion of the testimony of its meat industry expert, Mr. Carter. Much of Mr. Carter's testimony dealt with visual leanness and the meaning of the letters "BCVL". Our finding above, that the trial court did not abuse its discretion when it excluded evidence on those subjects, applies equally to the court's decision to exclude Carter's testimony about those topics.

Carter, however, was offered as an expert witness on another subject as well. He would have testified, according to Florence, that there exists a "trade custom" that the Guidelines do not apply if the beef was not originally packed and shipped to meet the contract specifications.

Custom and usage is relevant to contract interpretation and no ambiguity need be shown before such evidence may be admitted, *Nanakuli Paving & Rock Co. v. Shell Oil Co.*, 664 F.2d 772 (9th Cir. 1981). However, Massachusetts General Laws c. 106, § 1–205(4) provides that "[t]he express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable, express terms control both course of dealing and usage of trade."

In this case, the express terms on the Sales Confirmations Orders called for the buyer to accept as "full settlement" an allowance for excessive fat content based on the selling price. The Guidelines, which the court allowed into evidence based on trade usage *and* course of dealing between the parties, can reasonably be construed as consistent with the express terms. Carter's testimony about a contrary "custom" can not be so construed. Furthermore, the only apparent basis for Carter's conclusion about the existence of such a "custom" is one incident when his supplier took back some beef because it was marked "BCVL".

Thus, the rejection of Carter's offered testimony about a "custom" is also justified on the ground of improper and inadequate foundation, and we cannot say the trial court abused its discretion by excluding that testimony.

## (3) THE PAROL EVIDENCE RULE

Among the many evidentiary rulings the trial court made rejecting evidence Florence offered, one finds a number of instances in which the ruling could conceivably have been based upon the parol evidence rule. The appellant marshals all of these instances and appeals on the separate ground that they amount to erroneous invocation by the trial judge of the parol evidence rule. We can reject that contention summarily.

Although the record contains some language that might suggest the trial court relied on the parol evidence rule, as a whole the record demonstrates that the trial court's main concern was with relevance, lack of foundation and possible jury confusion. We have already found that the court did not abuse its discretion when it excluded the evidence on those grounds.

Whether or not the court also relied on the parol evidence rule, we are free to affirm on any ground supported by the record. *Doe v. Anrig*, 728 F.2d 30 (1st Cir.1984). The trial court's rulings are adequately supported.

For the reasons stated above, the judgment of the trial court is

*Affirmed.*