RICHARD CARRIGG vs. AUGUSTINE CORDEIRO & another, executors.[1]

No. 87-1401.

Bristol. October 17, 1988. — November 29, 1988.

Present: KASS, CUTTER, & SMITH, JJ.

Contract, Sale of real estate, Construction of contract, Specific performance. *Real Property*, Life estate. *Mortgage*, Priority.

Specific performance of a purchase and sale agreement was incorrectly ordered where the parties to the transaction had never reached agreement with respect to the priority or subordination of the seller's life interest in the property. [614-617]

CIVIL ACTION commenced in the Bristol Division of the Probate and Family Court Department on September 24, 1985.

The case was heard by *Edwin Livingstone, Jr.*, J.

*Thomas P. Crotty* for the defendants.

*James P. Killoran* for the plaintiff.

CUTTER, J. Carrigg filed in a Probate Court on September 24, 1985, a complaint seeking specific performance of a purchase and sale agreement, dated July 25, 1985, between him and Cizaltina Cordeiro. Miss Cordeiro died on December 18, 1987, after the trial and the filing on December 11, 1986, of notice of appeal in this case. The agreement related to a three-family house in Fall River (the locus). The judge found that Miss Cordeiro, sixty-seven years old at the time of trial, had been born in the house and had lived in it all her life. The agreement contained various provisions, which in some respects appear not to be consistent with each other. Whether such inconsistency exists gives rise to the present controversy.

[1] Manuel M. Cordeiro who, with Augustine Cordeiro, was an executor of the will of Cizaltina Cordeiro.

*Article 4* of the agreement provided that the locus was "to be conveyed by a good and sufficient [q]uitclaim [d]eed. Said deed shall convey *good and clear record and marketable title* thereto, *free from all encumbrances* except provisions of local zoning law, if any, and municipal betterments, and all easements, restrictions and rights of way, if any, provided they do not substantially interfere with the intended use of the premises" (emphasis supplied). The transfer was to take place at the Fall River registry of deeds "on or before September 6, 1985," unless otherwise agreed. A two-week postponement of the closing was arranged by agreement. Time was to be of the essence.

*Article 6* of the agreement reads, "Full possession of . . . [the locus] is to be delivered to the Buyer at the time of the delivery of the deed . . . . The Seller and Buyer agree that as part of this sales agreement the *Seller shall have the right to continue to live in the first floor apartment for as long as she desires to live there,* and to use her washer and dryer in the basement to the same extent as they are presently used. She shall pay to the Buyer for said use the rent of . . . $55 . . . per week, and on the anniversary date of said lease the said rent is to be increased by three and one-half . . . percent each year, for a period of seven . . . years. Thereafter the rent shall be seventy . . . dollars per week for the duration of the lease"[2] (emphasis supplied).

*Article 7* provided that the total price was to be $89,900, and by art. 11 a "fee for professional services" of $5,394 was to be paid by the seller to a named broker only in the event of a completed sale to the buyer.

*Article 9* made the agreement "contingent upon the Buyer's ability to obtain a *conventional* mortgage loan of *at least* . . . $85,405 . . . at current mortgage interest rates. The Buyer agrees to apply for said mortgage forthwith and to make every effort to obtain said mortgage loan. In the event the Buyer is

---

[2] By art. 3, excepted from the provision conveying "landlord's fixtures belonging to the Seller", were "the washer and dryer . . . in the basement, which are to remain the property of the Seller and to be used by her in accordance with a lease as hereinafter provided."

unable to obtain a commitment for said mortgage loan by August 16, 1985, *the Buyer shall so advise the Seller and Broker in writing on or before said date and this agreement shall become null and void and all payments made hereunder shall be refunded.* If such written notice is not received by the Seller and Broker within the time specified, the Buyer shall be bound to perform his obligations under this contract" (emphasis supplied).

If the deal had gone through, Miss Cordeiro would have made a sale to Carrigg for a net amount of $84,506 ($89,900 *less* the broker's commission of $5,394), which was about $6,500 less than the amount of the mortgage of $91,000 to be placed upon the property according to the undisputed testimony of Carrigg's father, who was agent for the buyer. Thus, as Carrigg would have initially no clear equity in the locus, there was real occasion for apprehension about what Miss Cordeiro's position would be in the event of a foreclosure of the contemplated mortgage, unless her position was protected by some form of subordination of the mortgage to her somewhat unusual life interest. See as to the nature of that life interest, *Tinkham* v. *Wind,* 319 Mass. 158, 159-160 (1946).

The sale of the locus was not completed on the date set in the agreement as extended because, prior to the closing, discussions took place about methods of protecting Miss Cordeiro's life interest in the first floor apartment, whatever it was. The judge concluded that the dispute "arose over . . . whether . . . [a] lease [to Miss Cordeiro] be recorded before the [proposed] mortgage or after." That dispute, so the judge decided, "was never resolved." The judge also found, "Both parties understood that the [proposed] lease . . . was to be in writing and that Carrigg was to obtain a mortgage to finance the purchase, the only issue being the order of recording" of these instruments called for by the agreement.

Other "findings" by the judge were based solely on his interpretation of the written agreement which is a matter as fully open for decision in this court as it is to the trial judge. See *Robert Indus., Inc.* v. *Spence,* 362 Mass. 751, 755 (1973, where the Supreme Judicial Court said, "The interpretation of

an integrated agreement is a matter of law on which we are
not bound by the trial judge's conclusions unless the problem
of interpretation is affected by findings of fact." We do not
perceive any respect in which the judge's findings of fact affect
interpretation of the written agreement. His further purported
findings[3] were essentially an interpretation of the agreement
in a manner which utterly disregarded (and left exposed to
forfeiture by a mortgage foreclosure) Miss Cordeiro's life in-
terest in the first floor of the locus.

The judge ruled, *first*, that Carrigg was entitled to judgment
ordering specific performance by a conveyance "free from all
encumbrances," *second*, that a lease be given to Miss Cordeiro
"subordinated to a conventional mortgage loan . . . of not less
than $85,405, and, *third* that thereafter Miss Cordeiro could
record her lease. He also ruled that the broker was entitled to
a commission of $5,394. The evidence showed that the attorney
for the proposed mortgagee had seen the agreement prior to
the date for closing and firmly had refused to proceed with the
financing if Miss Cordeiro's interest was to be given any form
of priority over the mortgage.

We think that this is a case where there has been no mutual
assent by Carrigg and Miss Cordeiro to any plan for protecting
her life interest in the first floor. The judge was certainly
correct that there was no explicit provision in the agreement
that Miss Cordeiro's lease was to have priority over the
mortgage. It seems plain, however, that to Miss Cordeiro her
life interest was important. As the trial judge put it, "she was

---

[3] The judge said in this portion of his decision, "At no place in the
agreement . . . [were] there any provisions for the execution of a written
lease and . . . [its] recording . . . and . . . the subordination of the mortgage
to the lease. . . . [A]t the time of performance Carrigg had arranged for
. . . the financing and was ready, willing, and able to perform in accordance
with the . . . agreement[.] . . . [A] recording of the lease prior to the
mortgage effectively [would have] prevented Carrigg from performing the
agreement . . . as it would have created an encumbrance preventing Carrigg
from obtaining a good and clear record and marketable title free from all
encumbrances thereby barring Carrigg from securing the necessary funds
from the mortgagor and concluding the purchase."

born there [at the locus] and she wants to die there." Because of her family memories of the locus, she felt secure there.

We conclude that the parties to this transaction never reached an agreement about what to do about the protection of Miss Cordeiro's life interest. The importance of its protection was obvious and more explicit language could and should have been employed in the agreement to emphasize that circumstance. We do not regard the reference in art. 9 of the agreement (quoted earlier) to a "conventional" mortgage as carrying with it any suggestion that the mortgage was clearly to be paramount to all interests not specifically mentioned. The framers of the agreement should have recognized that they had not dealt with a problem important to one of them and that they had created by their neglect of precision and completeness, not merely an ambiguity, but a complete absence of any understanding which had received mutual assent.

Carrigg contends that the absence of any provision for subordination of the mortgage to Miss Cordeiro's interest favors an interpretation of the agreement that her interest was to be subordinate to the mortgage. He adds that the lease would be an encumbrance (and it certainly would be) which would conflict with the agreement provision requiring a conveyance "free from all encumbrances." The short answer to these two contentions is that Carrigg had knowledge of Miss Cordeiro's claims to protection (as did Carrigg's mortgage company) and either was bound to deal with the potential conflict or he had no agreement susceptible of any enforcement.[4] Certainly he had

---

[4] It would be wrong in the present circumstances to make the artificial assumption "that the agreement is susceptible to judicial construction and, therefore, enforceable," see *Finn* v. *McNeil*, 23 Mass. App. Ct. 367, 371 (1987), in favor of either Carrigg or Miss Cordeiro, for example, by taking the view that Carrigg essentially undertook to use reasonable efforts to find a mortgagee that would agree to finance the deal and to subordinate the mortgage to Miss Cordeiro's lease, with the consequence that, as he had not done so, the final emphasized passage in art. 9 of the agreement in some manner would come into operation. See, e.g., *Stabile* v. *McCarthy*, 336 Mass. 399, 405-406 (1957), a case recently discussed in *McCarthy* v. *Mills, ante* 223, 229-231 (1988). This would give rise to the type of problem discussed in *Tremouliaris* v. *Pina*, 23 Mass. App. Ct. 722, 725-729 (1987), and (by contrast) the earlier decision in *Herrin* v. *Bouzianis*, 12 Mass. App.

no agreement entitled to specific relief. This, therefore, is not a case where for equitable reasons specific performance must be denied as matter of discretion. See *Raynor* v. *Russell*, 353 Mass. 366, 367 (1967).[5] *Roberts-Neustadter Furs, Inc.* v. *Simon*, 17 Mass. App. Ct. 262, 270 (1983). Compare *Bucciero* v. *Drinkwater*, 13 Mass. App. Ct. 551, 556 (1982).

Our interpretation of the agreement finds support in its structure. The agreement in general tracks much of the language of various standard forms of purchase and sale agreements. See, e.g., Lapatin, Standard Forms Guide, F-2, 65-68 (1986). The first sentence of art. 6 of the agreement in the present case (quoted above) bears close resemblance to the first sentence of art. 9 of the Greater Boston Real Estate Board form just cited. The language of art. 4 of the agreement before us also bears a close resemblance to parts of § 4 (and also other sections) of that form. Although the agreement in this case, as it appears in the record, obviously has been retyped, the language in art. 6 concerning Miss Cordeiro's life interest must have been inserted specially in some standard form for use in this case only.

As such an insertion, it falls within the principle discussed in *King Features Syndicate, Inc.* v. *Cape Cod Bdcst. Co.*, 317 Mass. 652, 654 (1945). There it was said (citations omitted), "The contract is to be interpreted as a whole. . . . *If possible*, reasonable effect must be given to all its provisions. . . . Its main purpose should be promoted *where its language permits*. . . . The same is true where the contract is partly printed and

---

Ct. 904 (1981). In the latter case, specific performance was held to have been correctly denied because the buyer's performance did not comply with the agreement as interpreted. In the present case, we conclude no agreement existed.

[5] At the arguments we were told that the controversy exists because the market value of the locus has increased substantially in recent years. We think that the situation must be examined in the light of the circumstances in September, 1985, when the agreement was negotiated. Miss Cordeiro lived over two years thereafter and by the provisions set out in art. 6 of the agreement, *supra*, gave some evidence of an expectation of the need to protect her life interest for some years after the date when she in fact died in late 1987. There is no inequity in a result which gives her heirs the benefit of the increase in market value of the locus.

partly written or typewritten, *although in case of conflict the printed part must yield to the other, which is more likely to represent the intent of the parties*" (emphasis supplied). To much the same effect, see Restatement (Second) of Contracts, §§ 202-203, especially § 203, comment f (1981); 4 Williston, Contracts, § 622, at 784-788 (3d ed. 1961 & Supp. 1988); 3 Corbin, Contracts, § 548 at 181-182, (1960 & Supp. 1984 at 502-504) where it is said, of specially inserted provisions in a standard form, "*If . . . there is conflict and inconsistency between a printed provision and one that was inserted by the parties especially for the contract that they are then making, the latter should prevail over the former. . . . A provision in handwriting or typewriting, prepared for the special contract, prevails over an inconsistent printed provision*; and one made with pen and ink is likewise preferred over one that is typed" (emphasis supplied), citing the *King Features Syndicate* case, 317 Mass. 652. We think the inserted language about Miss Cordeiro's life interest is entitled to so much greater weight than any of the language taken from any standard printed form that it must be treated as completely inconsistent with that derived from the printed form, with the consequence that there is no contract.

The complaint seeking specific performance must be dismissed. The counterclaims and other issues raised by the pleadings (see a stipulation mentioned in the record) are (in view of our decision) without merit. Neither party shall have costs of this appeal.

*Judgment reversed.*

*Judgment for the defendants.*