**DEN NORSKE BANK AS,**
**Plaintiff, Appellant,**

v.

**The FIRST NATIONAL BANK OF**
**BOSTON, et al., Defendants,**
**Appellees.**

**No. 95–1682.**

United States Court of Appeals,
First Circuit.

Heard Nov. 7, 1995.

Decided Feb. 2, 1996.

Glen Banks, with whom Steven C. Koppell
and Fulbright & Jaworski, LLP, New York
City, were on brief, for appellant.

Joseph L. Kociubes, with whom Mark W. Batten and Bingham, Dana & Gould, Boston, MA, were on brief, for appellees.

SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

Plaintiff Den norske Bank AS ("Den norske") appeals from a district court order granting summary judgment to defendant First National Bank of Boston ("First National")[1] on its claims for breach of contract and breach of fiduciary duty. We vacate the judgment.

## I

### BACKGROUND

In 1985, First National loaned $43.2 million to Glades Roads Associates ("Glades Roads") to construct an office building in Florida, and took a first mortgage on the Project. In 1986, appellant Den norske entered into a Loan Participation Agreement ("Agreement")[2] with First National. Den norske purchased approximately 17% (or $7.5 million) of the Glades Roads loan. First National retained an 83% interest in the loan, and served as "Principal"—the party charged with administering the loan. The Agreement also provided, in pertinent part:

11. *Approval of Principal's Actions.* Principal [First National] agrees that it shall *not without prior written agreement* by all Participants: (1) *reduce the amount of the Loan principal* or interest payments; (2) reduce the Loan interest rate; (3) postpone for a period of more than 60 days any due date for payment of the Loan principal; (4) release or subordinate any of the collateral or waive any claim against any guarantor or person who may be secondarily liable who would have a material, adverse effect on the collection and en-

forcement of the Loan or the Loan documents; (5) suspend the accrual of Loan interest.

*In other matters concerning the routine administration of the loan,* [First National] agrees not to deviate from the Loan Documents unless the majority (dollars outstanding) of the lending institutions agree to the change provided [First National] is in the majority. In all cases where a consensus cannot be reached on matters of administration that is acceptable to [First National], [First National] agrees to *adhere* to the Loan Documents.

*In all cases pertaining to default,* [First National] agrees to adhere to [Section] 13.

. . . .

13. *Loan Default Procedures.* [First National] and Participants agree that in case of default, *courses of action* will be agreed to by a majority (dollars outstanding) of the lending institutions providing [First National] is in the majority. In cases where a consensus cannot be reached on matters pertaining to default that is acceptable to [First National], then [First National] agrees to *adhere* to the Loan Documents for all appropriate remedies.... (Emphasis added.)

In July 1991, Glades Roads defaulted on the note. At the time of the default, First National still held its 83% interest in the note; Den norske 17%. First National invoked the acceleration clause, made demand for the entire outstanding loan principal and accrued interest, then commenced foreclosure proceedings. In September 1991, however, First National asked Ernst & Young to evaluate the comparative benefit to First National of (i) an immediate foreclosure and (ii) a negotiated loan restructuring agreement whereby Glades Roads would make an immediate payment of $8 million and a five-year balloon payment of $17 mil-

---

1. References to "First National" include its predecessor, BancBoston, and references to "Den norske" include its predecessor, DnC America Banking Corp.

2. "In a typical [loan participation arrangement], one bank—the 'lead bank'—first makes the loan agreement with the borrower and then makes a separate agreement—the participation agree-

ment—with other banks, to which the lead bank sells shares in the loan (usually retaining a share for itself, however), evidenced by participation certificates. The result is that only the lead bank has a direct contractual relationship with the borrower." *First Nat'l Bank of Louisville v. Continental Ill. Nat'l Bank & Trust Co. of Chicago,* 933 F.2d 466, 467 (7th Cir.1991).

lion, and First National in turn would "forgive" $9.6 million. Valuing the Glades Roads project at $24.7 million, Ernst & Young recommended restructuring rather than foreclosure. Den norske, believing that the Project was worth far more, preferred to foreclose, hold the property for five years, and collect rental income. First National rejected the Den norske proposal and opted for its own five-year restructuring plan.

In 1992, Den norske brought this diversity action against First National in federal district court, alleging that First National's failure to obtain "prior written agreement by all Participants" with the Glades Roads loan forgiveness arrangement, pursuant to § 11 of the Agreement, *supra* pp. 2–3, constituted breach of contract, breach of fiduciary duty, and an unfair trade practice. The district court initially denied cross-motions for summary judgment, finding §§ 11 and 13 of the Agreement ambiguous. *Den Norske Bank AS v. First Nat'l Bank of Boston*, 838 F.Supp. 19 (D.Mass.1993).[3]

Following discovery, however, the court reconsidered, eventually awarding summary judgment to defendant First National on the remaining Den norske claims. *Den Norske Bank AS v. First Nat'l Bank of Boston*, No. 92–11294–NMG, 1993 WL 773796 (D.Mass. May 24, 1995). The court concluded that § 11 unambiguously entitled Den norske to veto a loan forgiveness *only in the pre-default* stage of "routine" loan administration, but that § 13 gave First National the right to choose any "course of action" thereafter. *Id.* at *3. The court ruled also that even if the Agreement were determined ambiguous, Den norske's extrinsic evidence was insufficient to support a rational inference that the parties intended to give Den norske a *post-default* veto. *Id.* at *4 ("The extrinsic evidence submitted by the plaintiff is unpersuasive and does not create an ambiguity or a genuine issue of material fact.").

## II

### DISCUSSION

Den norske presents a two-part challenge to the summary judgment ruling. First, it contends that proper contract interpretation requires summary judgment against First National because § 11 unambiguously ordains that First National cannot unilaterally "reduce the amount of the [Glades Road] Loan principal" *under any circumstances,* including the borrower's default, and no provision in § 13 countermands the specific prohibition in § 11. Second, even assuming §§ 11 and 13 were ambiguous or inconsistent, Den norske's extrinsic evidence raises genuine factual disputes—as to whether the contracting parties intended to afford Den norske a unilateral veto over any post-default loan forgiveness [hereinafter: "veto"]—which cannot be resolved at summary judgment.

### A. *Applicable State Law*

 Interpretation of the Agreement is governed by Massachusetts law. *See* Agreement § 22. Normally, contract interpretation is a question of law for the court. *Fairfield 274–278 Clarendon Trust v. Dwek*, 970 F.2d 990, 993 (1st Cir.1992); *Freelander v. G. & K. Realty Corp.*, 357 Mass. 512, 258 N.E.2d 786, 788 (1970). Should the court find the contract language unambiguous, we interpret it according to its plain terms. *See Dwek*, 970 F.2d at 993; *Hiller v. Submarine Signal Co.*, 325 Mass. 546, 91 N.E.2d 667, 669–70 (1950).

 If, however, the contract language is ambiguous, on its face or as applied, contract meaning normally becomes a matter for the factfinder. *See Dwek*, 970 F.2d at 993; *Freelander*, 258 N.E.2d at 788. Although not admissible either to contradict or alter express terms, extrinsic evidence is admissible to assist the factfinder in ascertaining the intent of the parties as imperfectly expressed in ambiguous contract language. *See Robert Indus., Inc. v. Spence*, 362 Mass. 751, 291 N.E.2d 407, 410 (1973). In descending order of importance, extrinsic evidence may include: (1) the parties' negotiations on the particular loan, *see Merrimack Valley Nat'l*

---

**3.** The district court dismissed the unfair trade practice claim, a decision not challenged on appeal.

*Bank v. Baird,* 372 Mass. 721, 363 N.E.2d 688, 690 (1977); *Charles River Mortgage Co. v. Baptist Home of Mass.,* 36 Mass.App.Ct. 277, 630 N.E.2d 304, 306, *review denied,* 418 Mass. 1101, 636 N.E.2d 278 (1994); (2) their course of performance, *see Affiliated FM Ins. Co. v. Constitution Reins. Corp.,* 416 Mass. 839, 626 N.E.2d 878, 882 n. 10 (1994) (citing Restatement (Second) of Contracts § 203(b) (1981)); (3) their prior course of dealing, *see id.;* and (4) trade usage in the relevant (viz., banking) industry, *see id.* at 881–82 (citing Restatement § 222 cmt. b (1981); *A.J. Cunningham Packing Corp. v. Florence Beef Co.,* 785 F.2d 348, 351 (1st Cir.1986)); *Baccari v. B. Perini & Sons, Inc.,* 293 Mass. 297, 199 N.E. 912, 915–16 (1936); *see also Jamesbury Corp. v. Worcester Valve Co.,* 443 F.2d 205, 210 (1st Cir.1971) (citing 3 Arthur L. Corbin, *Corbin on Contracts* § 542, at 108 (1970)).

### B. *Standard of Review*

██ We examine a grant of summary judgment *de novo,* with a view to whether there is a "genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Byrd v. Ronayne,* 61 F.3d 1026, 1030 (1st Cir.1995). Once the moving party (First National) makes this showing, the party bearing the ultimate burden of proof (Den norske) cannot rest on mere allegations, but must proffer sufficient competent evidence upon which a rational trier of fact could find in its favor. *See, e.g., Milton v. Van Dorn Co.,* 961 F.2d 965, 969 (1st Cir.1992) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). " '[A]n argument between parties about the meaning of a[n] [ambiguous] contract is typically an argument about a "material fact," ' " and summary judgment is normally unwarranted unless " 'the [extrinsic] evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide [to] the contrary.' " *Allen v. Adage, Inc.,* 967 F.2d 695, 698 (1st Cir.1992) (quoting *Boston Five Cents Sav. Bank v. Secretary of Dep't of HUD,* 768 F.2d 5, 8 (1st Cir.1985)); *Blanch-*

ard v. Peerless Ins. Co., 958 F.2d 483, 491 (1st Cir.1991) (same). Nonetheless, we must resolve all genuine factual disputes, and any competing rational inferences, in the light most favorable to Den norske, the party against whom summary judgment entered. *See Byrd,* 61 F.3d at 1030.

### C. *Interpretation of Participation Agreement*

#### 1. *Contract Ambiguity*

██ The district court found that the Agreement unambiguously afforded First National, *qua* majority participant, the unilateral right to forgive principal on *post*-default loans. *Den Norske Bank AS,* 1993 WL 773796, at *3. The court reasoned that the prohibition against debt forgiveness in § 11, ¶ 1, applies *only* to *pre*-default loans. *See supra* Section I. Section 11, ¶ 2, of the Agreement refers to "*other matters* concerning the *routine* administration of the loan." (Emphasis added.) The phrase "other matters" suggests that ¶ 2 is residual; that is, ¶ 1 describes all other "matters" relating to "routine" loan administration not described in ¶ 2. By definition, *post*-default administration of a loan is *not* "routine," and therefore cannot be governed by § 11. We do not agree.

First, though the district court drew a perfectly plausible inference from the contract language, we do not think it can be considered the *only* reasonable inference. For one thing, the § 11 caption states "Approval of Principal's *Actions,*" not "Approval of Principal's *Pre-default* Actions." The district court implicitly assumed that the phrase "concerning the routine administration of the loan," in ¶ 2, stood in apposition to the term "matters," whereas it is as faithfully understood to refer to the phrase "other matters." In other words, § 11, ¶ 2, can be construed to suggest that § 11, ¶ 1, adverts to "other matters" (i.e., actions taken by the lead bank) of such overriding importance to minority participants as to preclude their characterization as "routine" matters.

Next, if the contracting parties intended *to supplant, in its entirety,* the § 11 definition of the parties' rights and obligations upon the

occurrence of a borrower default, § 11, ¶ 3, is oddly couched. For instance, § 11, ¶ 3, does not say: "In the event of default, the *parties* agree that loan administration will be *governed* (or *controlled*) by Section 13." Rather, the choice of language is more inscrutable: "In all cases pertaining to default, [*First National*] agrees to *adhere* to Paragraph 13." (Emphasis added.) This language lends conspicuous ambiguity in at least two significant respects. First, ostensibly it imposes a contractual obligation (i.e., "adherence") upon First National *alone, and not on Den Norske.* It suggests that though § 13 imposed additional *obligations* on First National, *see, e.g.,* Agreement § 13 (noting that, if the majority of participants cannot reach a consensus, First National, *qua* Principal, must "adhere" to loan documents in selecting "appropriate remedies"), it was not intended to supplant any Den norske contractual *right* already enumerated in § 11. And, at least arguably, the broad-based caption to § 11— "Approval of Principal's *Actions* "—intimates that Den norske's unconditional right of veto extends to matters embraced by the phrase "courses of *action* " in § 13. Second, unlike "govern" and "control," the verb "adhere" cannot be read to rule out the possibility that § 13 merely *supplements* § 11 and does not *displace* it as the only provision defining the parties' contractual rights and obligations in the post-default period.

First National counters that Den norske's alternate interpretation would render § 13 a virtual nullity, *see Merchants Nat'l Bank v. Stone,* 296 Mass. 243, 5 N.E.2d 430, 433 (1936) (noting that, where possible, no part of contract should be deemed .superfluous),[4] since it would preclude First National from pursuing some otherwise appropriate "courses of action" following a default by the borrower. On the contrary, though Den norske's interpretation may *limit* First National's post-default prerogatives under § 13,

clearly it does not render § 13 wholly *superfluous.* So construed, section 13 still would reserve considerable decisional latitude to the lead bank, permitting First National to choose any post-default "course of action," even an innovative one not specifically described in the loan documents, as long as it did not choose a course of action (e.g., unilateral loan principal forgiveness) *expressly prohibited* under § 11, ¶ 1.

First National next argues that its interpretation represents the only "common sense" reading of the Agreement that comports with the economic realities underlying loan participation agreements, which are by their very nature *risk-spreading* financial arrangements. Thus, a lead bank (at least one which remains the majority participant) retains a much greater financial stake in maximizing loan recoveries than do the minority participants. Consequently, upon a default a minority participant should not be able to take unfair advantage of the majority participant by invoking a veto, thereby forcing the majority either to take a "course of action" it deems inappropriate, or to buy out the minority participant's share at a premium. *See, e.g., First Nat'l Bank of Louisville v. Continental Ill. Nat'l Bank & Trust Co. of Chicago,* 933 F.2d 466, 470 (7th Cir.1991) ("The banks that had financed five-sixths of the loan thought it in their best interest not to call the loan, despite the borrower's default. Given that decision, it was in [the minority participant's] interest to play dog in the manger. . . ."); *see also Carondelet Sav. & Loan Ass'n v. Citizens Sav. & Loan Ass'n,* 604 F.2d 464 (7th Cir.1979); *Mark Twain Bank v. Continental Bank, N.A.,* 817 F.Supp. 792 (E.D.Mo.1993).

The "economic realities" driving participation agreements vary too widely in individual cases to control the "four corners" analysis of the Agreement in this case.[5] As

---

**4.** Meeting parry for thrust, Den norske argues that First National's interpretation would render § 11, ¶ 1, a nullity, since a lead bank rarely (if ever) would have occasion (or need) to forgive a loan unless the borrower were in default. Although this proposition has some appeal, it suffers from the same defect as First National's "nullity" argument; viz., neither *conclusively* resolves the *facial* contract ambiguity so as to

enable summary judgment. Of course, customary banking practices may be introduced as circumstantial extrinsic evidence of usage of trade, from which a jury might infer contract meaning. *See infra* Section II.C.2(b).

**5.** *See generally* Eric M. Schiller, Scott A. Lindquist, & Christopher Q. King, *Current Issues in Loan Participation and Co–Lending Agreements,*

with all contracting parties, "each bank [negotiating a participation agreement] wants to preserve, *so far as possible,* its freedom of action," *First Nat'l Bank of Louisville,* 933 F.2d at 470 (emphasis added), yet this intuition is tempered by its assessment as to the financial benefits which would accrue in the event a mutually acceptable "compromise" agreement can be achieved. For example, lead banks utilize participation agreements (1) to spread credit risks by diversifying their loan portfolios, *see Banco Espanol de Credito v. Security Pac. Nat'l Bank,* 973 F.2d 51, 53 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2992, 125 L.Ed.2d 687 (1993); W.C. Lott, et al., *Structuring Multiple Lender Transactions,* 112 Banking L.J. 734 (1995); Note, *Bankruptcy and the U.C.C. as Applied to Securitization,* 73 B.U.L.Rev. 873 (1993); (2) to avoid regulatory lending limits, *see, e.g.,* 12 C.F.R. § 32.107 (1985), thereby permitting lead banks to make more capital available to important commercial clients, *see* Andrew Strehle, *Teaching Old Laws New Tricks: The Prospect for Loan Participation Regulation,* 13 Ann.Rev.Banking L. 421, 423–24 (1994); and (3) to generate fees from servicing and administering loans. *See generally First Nat'l Bank of Belleville v. Clay–Hensley Comm'n Co.,* 170 Ill.App.3d 898, 121 Ill.Dec. 411, 413–14, 525 N.E.2d 217, 219–20 (1988) (describing various "lead bank" incentives for negotiating participation agreements).[6] It cannot be ascertained conclusively—*solely* by scrutinizing the terms of the Agreement—how much First National was prepared to concede, *in 1986,* to obtain Den norske's agreement to advance $7.5 million and to assume a percentage of the risk associated with the Glades Roads Note. Accordingly, there is no reliable way to identify the particular economic realities at work in the First National–Den norske loan participation relationship without recourse to extrinsic evidence. *See infra* Section II.C.2.

Finally, the cases First National relies upon as support for its "economic reality" interpretation are inapposite. In *Carondelet,* for example, the participation agreement was utterly *silent* as to the existence of an analogous minority-held veto (over decisions whether to declare loan defaults), whereas the Agreement in our case clearly incorporates a veto provision (§ 11, ¶ 1), though its intended *scope* (i.e., pre- or post-default) is demonstrably *ambiguous. Carondelet Sav. & Loan Ass'n,* 604 F.2d at 470; *see also First Nat'l Bank of Louisville,* 933 F.2d at 470 (noting that minority participant's contract interpretation "lacks textual support"). Moreover, the Seventh Circuit ultimately discussed "economic realities" only in conjunction with its review of the *extrinsic evidence* of custom and usage credited by the factfinder, and not in connection with the question whether the agreement was facially unambiguous *as a matter of law. Carondelet Sav. & Loan Ass'n,* 604 F.2d at 470. Finally, *Carondelet* was an appeal from a *final judgment* for the lead bank following a *bench trial,* and not from a grant of summary judgment. *Id.* at 468. There the factfinder's assessment of extrinsic evidence would have been reviewed only for clear error.

### 2. *Extrinsic Evidence*

▮ As the Agreement is amenable to more than one reasonable interpretation, we must determine whether Den norske adduced enough competent extrinsic evidence of the contracting parties' intent to support a rational jury verdict in its favor. *See Blanchard,* 958 F.2d at 491. The district court concluded that the extrinsic evidence proffered by Den norske could not support a rational inference that §§ 11 and 13 afforded Den norske a post-default veto. *Den Norske Bank AS,* 1993 WL 773796, at *4. The Den

C974 ALI–ABA 457, 464 (1995) ("Generalizing about enforcement of loan participation and colending agreements is nearly impossible. Although there is some uniformity in terms among these agreements, the resolution of any conflict will necessarily turn almost entirely upon the precise terms of the contracts, which may differ substantially from one transaction to the next. Moreover, in applying legal standards prescribed by the contracts, consideration of the facts and circumstances of each individual case is necessary.").

6. By contrast, minority participants look to limit credit search and administration costs associated with making direct loans or investments, *see Note,* 73 B.U.L.Rev. at 873, and to obtain higher interest rates on their investments, *see Banco Espanol de Credito,* 973 F.2d at 53.

norske extrinsic evidence pertains to the contract negotiations and to "usage of trade" in the banking industry.

### (a) *Contract Negotiations*

Den norske adduced evidence that First National normally used its own standardized form contract for all its participation agreements in the mid–1980s, that First National's Florida-based loan officers were permitted to customize these agreements in negotiations with prospective minority participants, and that Liska Langston, one of these loan officers, wrote a letter in April 1986 noting that *specific changes* had been made to the First National–Den norske agreement. Langston highlighted the changes on a copy of the "*revised* Participation Agreement," *including an entirely redrafted version of § 11.* Den norske contends that this circumstantial evidence invites a rational inference that it deliberately negotiated changes to the standardized version of § 11 to assure itself a veto. *See In re 604 Columbus Ave. Realty Trust,* 968 F.2d 1332, 1358 (1st Cir.1992) (noting that, under Massachusetts contract law, specifically *negotiated* contract terms normally control over *standardized* contract provisions) (citing *Carrigg v. Cordeiro,* 26 Mass.App.Ct. 611, 530 N.E.2d 809, 813 (1988), *review denied,* 404 Mass. 1101, 536 N.E.2d 612 (1989)).

First National responds that the extrinsic evidence proffered by Den norske is insufficient, for two reasons. It cites affidavits and depositions which attest that (i) the so-called "revised" version of § 11 actually was part of a standardized First National form; or (ii) the negotiating officers (including Liska Langston) could not recall having *discussed* any proposed § 11 changes with Den norske in 1986. These contentions, which bear on the *weight* to be given the circumstantial evidence proffered by Den norske, do not undermine Den norske's argument that genuine issues of material fact remain unresolved. *See Byrd,* 61 F.3d at 1030.

First, it is not at all surprising that a loan officer might not recall the *unrecorded* details of a decade-old negotiation, such as particular *oral conversations.* Moreover, Langston confirmed that her signature appears on the April 1986 letter highlighting certain substantial "changes" and "revis[ions]" to standardized form § 11 arrived at through negotiation. Thus, the authenticated, uncontradicted April 1986 letter signed by Langston could support a rational inference that Den norske had proposed specific changes in § 11, and that First National was announcing its agreement with the Den norske counterproposal. *See* Deposition Exhibit No. 6 (Langston Letter dated April 14, 1986) ("[A]dvise us as soon as possible if you concur [with these "changes" and "revis[ions"]].").

In the same vein, Den norske proffered participation agreements it negotiated with lead banks other than First National, wherein it *consistently* reserved a minority veto, as circumstantial evidence that Den norske would not have intended that its First National loan participation be any exception. *See Vadala v. Teledyne Indus., Inc.,* 44 F.3d 36, 39 (1st Cir.1995) ("Certainly the fact that there is a pattern of occurrences, reflecting an apparent cause and effect sequence, can strengthen the likelihood that the present case is one more in the pattern. This is how human beings reason about circumstantial evidence."). Coupled with other extrinsic evidence proffered by Den norske, *see infra* Section II.C.2(b), these exhibits—if admitted at trial and credited by the jury—could contribute to a rational inference that the contracting parties intended to depart from the standardized First National form versions of § 11 and § 13 so as to provide Den norske with a veto over any loan forgiveness arrangement. *See In re 604 Columbus Ave. Realty Trust,* 968 F.2d at 1358.

### (b) *Usage of Trade*

Den norske proffered extrinsic evidence— pertaining to the relevant 1985–86 period— that it was common, *industry-wide,* to incorporate such minority participant veto powers over loan forgiveness arrangements. The evidence took three forms: (1) affidavits from current and former commercial loan officers (viz., Den norske Vice President David Schwarz and former Vice President Daniel deMenocal) based on their personal knowledge of banking industry practices; (2)

learned treatises on the banking industry, *see, e.g.,* Sandra Stern, *Structuring Loan Participation* ¶ 1.05(1)(d), at 1–20 (1992) ("Typically, participation agreements provide that the lead bank may agree to modification of the loan documents [if the loan becomes delinquent] . . . *as long as it does not reduce the amount of principal due . . . .*") (emphasis added);[7] and (3) participation agreements negotiated by Den norske with other lead banks, wherein Den norske consistently reserved such a veto. First National argues that this "usage of trade" evidence is insufficiently probative, for three reasons.

■■■■ First, it contends that Den norske's affiants were not qualified to give expert testimony on banking industry practices. We do not agree. Whatever may have been Schwarz' qualifications,[8] deMenocal was a *forty-year* banking veteran (with Citibank and Den norske) who attested that he had (i) served as a vice-president in charge of "large commercial loan transactions," (ii) had "become very familiar with participation agreements from the perspective of both the lead bank and the participating banks," and (iii) observed firsthand the "well established industry custom[ ] and practice[ ]" to allow such minority-participant vetoes. Under Massachusetts law, this is the type of testimony through which "usage of trade" is established. *See, e.g., Baccari,* 199 N.E. at 916 (noting that "[t]he testimony of a witness who had been employed as a road builder for *twenty-eight years* was sufficient to warrant a finding of a usage, and that these parties contracted with reference to it," and observing that the "credibility" of witnesses describing usages of trade ultimately is a *factual* question "for the master") (em-

phasis added); *Barrie v. Quimby,* 206 Mass. 259, 92 N.E. 451, 453 (1910) ("The witness [on 'usage'] testifies to the existence of a fact from actual knowledge, acquired through observation and experience in the business . . . ."); *Industrial Eng'g & Metal Fabricators, Inc. v. Fontaine Bros.,* 2 Mass.App. Ct. 695, 319 N.E.2d 726, 727–28 (1974) (discerning no error in factfinder's reliance on affidavit of person whose "recitation of his background and qualifications affirmatively demonstrated his competence to testify of his own personal knowledge on the factual issue of whether there was a custom in the trade") (citation omitted); *see also Leibovich v. Antonellis,* 410 Mass. 568, 574 N.E.2d 978, 982 (1991) (noting that jury is arbiter of "soundness" of expert testimony, and that "[o]ne factor in assessing the strength of expert testimony is the expert's knowledge and experience"). First National has not demonstrated to our satisfaction that deMenocal would not be permitted to provide expert testimony at trial. *See* Fed.R.Evid. 702, 703; *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1992) (noting that trial court serves "gatekeeper" function in determining competency, qualifications, and "helpfulness" of expert testimony); *see also United States v. Saccoccia,* 58 F.3d 754, 781 (1st Cir.1995) (same). Moreover, Den norske cites to published treatises on standard banking practices, excerpts from which may be admissible at trial in support of deMenocal's testimony. *See* Fed.R.Evid. 803(18); *Carondelet Sav. & Loan Ass'n,* 604 F.2d at 470 (noting that defendant relied on expert testimony and learned treatises to prove usage of trade, in

---

**7.** *See generally* Eric M. Schiller, Scott A. Lindquist, Christopher Q. King, *Current Issues in Loan Participation and Co–Lending Agreements,* C974 ALI–ABA 457, 479–80 (1995) ("Most participation agreements allow fairly broad discretion to the lead lender on the issue of when to declare the loan in default or initiate enforcement action. This is quite logical given that the lead lender generally has the best understanding of the loan, the borrower, and the current situation. However, the lead lender's flexibility in dealing with loan defaults and remedies may not be as broad as it might at first appear. For example, the lead lender may be *prohibited* from waiving, releasing, or *modifying material provi-*

*sions* of the loan documents, *particularly payment provisions.*") (emphasis added).

**8.** First National argues that Schwarz is not competent to provide expert testimony on "usage of trade" because he did not deal frequently with loan participation agreements; thus, he could not form a reliable opinion as to prevalent banking practices. Since deMenocal's qualifications, at least those disclosed in the summary judgment record, clearly were sufficient to establish competence, we need not resolve the challenge to the Schwarz affidavit.

order to discern meaning of ambiguous language in loan participation agreement).[9]

■ Second, First National argues that the expert testimony proffered by Den norske merely represented self-serving statements which would help their employer, since both affiants were Den norske employees. Once again, however, we are not persuaded that First National has demonstrated that the *expert qualifications* of these affiants are undermined by their present and former association with Den norske so as to render their testimony *inadmissible*. Of course, such matters may bear heavily on witness credibility, bias, and the weight of the evidence. But these are matters for the factfinder. *See Newell Puerto Rico, Ltd. v. Rubbermaid, Inc.*, 20 F.3d 15, 23 (1st Cir.1994); *Leibovich*, 574 N.E.2d at 982 (noting that it is "[t]he jury's function, vis-a-vis an expert witness, . . . to assess the soundness and credibility of his opinions"). At summary judgment, moreover, courts normally assume that the trier of fact would credit the expert testimony proffered by the nonmovant (i.e., Den norske). *See Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1091 (1st Cir.1995); *Affiliated FM Ins. Co.*, 626 N.E.2d at 882 ("The existence and scope of a usage of trade are questions of fact.") (citing Restatement (Second) of Contracts § 222(2) (1981); *DiMarzo v. American Mut. Ins. Co.*, 389 Mass. 85, 449 N.E.2d 1189, 1201 (1983)); *see also* U.C.C. § 1–205(2).

■ Finally, First National argues that the proffered expert testimony is insufficiently probative of banking industry practices because it merely evidences "that participants generally *attempt* to *negotiate* such

protections," not that they generally *succeed* in obtaining such concessions from the lead bank.[10] Quite the contrary, the "typical" participation agreement usage with which Den norske's experts were familiar, and to which presumably they would testify, is that a minority participant veto is the industry norm. Moreover, if First National means to suggest that such "general" practices are not probative as to whether it is more or less likely that *particular* contracting parties harbored such an intent, it is simply in error. *Cf.* U.C.C. § 1–205(2) (noting that "usage of trade" includes "any practice or method of dealing having *such regularity* of observance . . . as to justify an expectation that it will be observed with respect to the transaction in question") (emphasis added); *Carondelet Sav. & Loan Ass'n*, 604 F.2d at 470 (noting that lead bank's extrinsic evidence of industry custom and usage, in the form of witness testimony and treatises, was admissible because it made it more "likely" that the contracting parties would not have intended to use an ambiguously broad term like "servicing" to exclude the lead bank's unilateral right to modify the loan documents if the industry custom were otherwise); *Affiliated FM Ins. Co.*, 626 N.E.2d at 882 ("The existence and *scope* of a usage of trade are questions of fact.") (emphasis added). The precise function of "usage of trade" evidence is to provide *circumstantial* proof of the contracting parties' intent. A party need not show that *all* participation agreements invariably entitle minority participants to post-default vetoes. *See id.* ("Where, as here, the contract language is ambiguous, evidence of custom and trade practice may be admitted to arrive at an interpretation ' "which ap-

---

**9.** Of course, the claim that First National was unaware of the "usage of trade" described by deMenocal is not controlling. *See, e.g., Berwick & Smith Co. v. Salem Press, Inc.*, 331 Mass. 196, 117 N.E.2d 825, 827 (1954) (noting that proof of defendant's "actual knowledge" of usage is unnecessary; " '[w]here the usage is established the *presumption* is that the parties contracted with reference to it' ") (quoting *Baccari*, 199 N.E. at 916) (emphasis added).

**10.** First National further argues that "deMenocal is *not entirely supportive* of Den norske's position," in that he asserted that it was "possible" that an "indirect" minority participant might not

have enough bargaining power to insist on a veto. DeMenocal described an inapposite scenario—called an "indirect" participation—in which an original lender participant enters into a *second* and collateral participation agreement with a "third bank" in order to allocate, *inter se*, the original participant's credit risk on the underlying loan. DeMenocal correctly noted that the "third bank" in such a scenario would have no direct contractual relationship with the borrower. Although Den norske (like most "direct" loan participants) likewise has no contractual relationship with the borrower—Glades Roads— *see supra* note 2, it is in no sense the type of "indirect" participant described by deMenocal.

pears to be in accord with justice and common sense and the *probable intention of the parties."'"*) (citations omitted; emphasis added).[11]

### III

### *CONCLUSION*

We therefore conclude that Den norske adduced sufficient competent extrinsic evidence which, if admitted at trial and credited by the jury, could support a rational verdict in its favor. The parties agree that the disposition of the breach of contract claim controls the breach of fiduciary duty claim. Consequently, *the summary judgment entered on counts 1 and 2 must be vacated. The case is remanded for further proceedings consistent with this opinion. Costs to appellant.*

*So ordered.*

---

**11.** First National likewise cites Den norske's internal credit manuals, which suggest that Den norske loan officers not agree to minority participant vetoes in any participation agreement negotiated for Den norske *as lead bank.* Viewed in the light most favorable to Den norske, however, these manuals merely suggest the obvious truth that it is likely that lead banks will almost always *negotiate* to avoid a minority participant veto provision. *See supra* Section II.C.1 (discussing First National's "economic reality" theory). By contrast, "usage of trade" deals not with contract negotiation, but with the "typical" *end product* included in negotiated loan participation agreements.