USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit
 
 ____________________
 
 No. 97-2289
 
 MICHAEL D. BANK, THOMAS M. DUSEL, AND ROBERT J. M. O'HARE,
 JR., in their Capacity as Trustees of the 400 Wyman Street
 Trust,
 
 Plaintiffs, Appellees,
 
 v.
 
 INTERNATIONAL BUSINESS MACHINES CORPORATION
 
 Defendant, Appellant.
 ____________________
 
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT
 FOR THE DISTRICT OF MASSACHUSETTS
 
 [Hon. Douglas P. Woodlock, U.S. District Judge]
 ____________________
 Before
 Selya, Boudin and Lynch,
 Circuit Judges.
 ____________________
 
 Kenneth E. Werner, with whom J. Charles Mokriski,
 Jonathan I. Handler and Day, Berry & Howard were on brief, for
 appellant International Business Machines Corporation.
 
 David W. Rosenberg, with whom Saul A. Schapiro,
 Thomas Bhisitkul and Rosenberg & Schapiro, P.C. were on brief,
 for appellees Michael D. Bank, Thomas M. Dusel and Robert J. M.
 O'Hare, Jr.
 ____________________
 
 May 29, 1998
 ____________________
 LYNCH, Circuit Judge. In this case, we must construe
 provisions of a complex partnership agreement between two
 sophisticated parties to a real estate development deal. We
 must determine whether the partnership agreement entitles one
 of those parties, the 400 Wyman Street Trust (Wyman), through
 its trustees, to call on its partner, International Business
 Machines Corporation (IBM), to provide a multi-million dollar
 capital contribution in this circumstance, involving the later
 refinancing of the original permanent loan. That refinancing
 involves the purchase of the original mortgage note, which
 provided the initial financing for the project, the development
 of an office building in Waltham, Massachusetts.
 In the district court, IBM moved for summary
 judgment, arguing that the agreement was unambiguous and
 imposed no such obligation on it. Wyman opposed IBM's motion,
 arguing that the agreement was ambiguous and that, under
 Massachusetts law, Wyman must therefore be permitted to submit
 parol evidence in the form of the testimony of its negotiating
 attorneys. The district court determined that, quite apart
 from any parol evidence, the agreement was unambiguous in its
 imposition of such a capital contribution obligation on IBM,
 and entered summary judgment sua sponte for Wyman. We agree
 that the agreement unambiguously supports Wyman's position and
 that resort to parol evidence is therefore unnecessary. We
 also find no error in the district court's decision to enter
 summary judgment sua sponte for Wyman. We affirm.
 I.
 In October 1986, IBM and Wyman entered into a
 partnership to develop and operate an office building at 400
 Wyman Street, Waltham, Massachusetts. Wyman contributed a
 parcel of land, valued by the parties at $19.3 million,
 received a majority interest of 51% in the partnership and was
 named the managing partner. For its part, IBM agreed to a
 long-term lease commitment, and also contributed $1 million at
 the outset of the agreement. IBM received a minority interest
 of 49% in the partnership. IBM also agreed to make additional
 capital contributions, if such contributions were "required for
 any purpose," so long as the two parties' "adjusted capital
 contributions" remained out of balance; i.e., those
 contributions did not reflect the 51:49 ratio of the parties'
 ownership shares in the partnership.
 The partnership planned to finance the project
 through a $75 million non-recourse mortgage note (the
 "permanent loan"), and obtained such a loan from Citicorp Real
 Estate, Inc., which subsequently sold it to a consortium of
 foreign banks for which Citicorp served as the agent. The
 partnership had difficulty generating sufficient revenue to
 make its loan payments. In 1995, the partnership entered
 negotiations with the lenders to refinance the permanent loan,
 which at that time had an outstanding principal balance of
 approximately $72 million. The lenders did not agree to a
 refinancing, but offered to sell the note outright for about
 $54 million.
 Wyman believed the offer was a good solution to the
 partnership's problems, but IBM disagreed, regarding the price
 as too high. To prevent the offer from expiring, Wyman caused
 its corporate affiliate, Wyman Loan Corp., to purchase the
 note, and then proposed that the note be resold to the
 partnership at cost. IBM opposed the plan. Wyman sought
 arbitration under the agreement, which requires that disputes
 concerning a "refinancing" proposal be arbitrated. IBM opposed
 arbitration on the ground that Wyman had not yet proposed a
 refinancing plan, but had only proposed that the partnership
 purchase the initial mortgage note, and that the issue was
 therefore not yet arbitrable.
 Wyman brought suit to compel arbitration under the
 agreement. The district court, agreeing with Wyman that the
 issue was arbitrable, granted Wyman's motion to compel
 arbitration. See Bank v. International Bus. Mach. Corp. (Bank
 I), 915 F. Supp. 491, 498-99 (D. Mass. 1996). This court
 reversed, holding that Wyman's motion to compel arbitration was
 premature because it had not submitted a concrete refinancing
 plan, but rather had proposed simply that the partnership
 acquire the initial mortgage note outright. This court
 regarded Wyman's proposal at that time as a proposal to acquire
 an interest in real property, which is not arbitrable under the
 agreement, rather than a refinancing proposal, which is. 
 See Bank v. International Bus. Mach. Corp. (Bank II), 99 F.3d
 46, 49 (1st Cir. 1996).
 The parties could not agree to a more concrete
 refinancing plan in part because they could not agree on the
 extent of IBM's obligation to provide additional capital
 contributions. Wyman thought the agreement provided it with
 the ability to call on IBM to provide a capital contribution
 sufficient to bring the parties' "adjusted capital
 contributions" into balance, which was approximately $17.5
 million, before it was obligated to seek third-party financing
 for the partnership. IBM did not dispute that it had some
 obligation under the agreement to provide additional capital,
 if such capital were required to complete the refinancing
 successfully, but thought that it was only required to
 contribute capital if sufficient funds could not be obtained at
 commercially reasonable rates from third-party lenders.
 Although the parties could not resolve this issue on
 their own, they agreed to a settlement which capped IBM's
 potential liability and posed one question for resolution by
 the court. The settlement agreement permitted IBM to exit the
 partnership upon a capital contribution of $6 million. This
 was done. The agreement also provided that Wyman would bring
 a declaratory judgment action to establish which partner's
 interpretation of the agreement was correct. Under the
 settlement agreement, if Wyman won its suit, IBM would pay it
 an additional lump sum of $4 million. If IBM won, it would be
 excused from any further liability under the partnership
 agreement.
 Wyman filed the contemplated declaratory judgment
 action. Before any discovery had taken place, IBM moved for
 summary judgment in its favor, arguing that the terms of the
 contract were unambiguous and did not require it to make the
 $17.5 million capital contribution. Wyman opposed IBM's motion
 for summary judgment on the ground that the contract did impose
 such an obligation and that summary judgment was inappropriate
 at this stage because it wished to present parol evidence that
 it contended would clarify potential ambiguities in the
 contract. See Den Norske Bank AS v. First Nat'l Bank of
 Boston, 75 F.3d 49, 52 (1st Cir. 1996) (under Massachusetts
 law, "extrinsic evidence is admissible to assist the factfinder
 in ascertaining the intent of the parties as imperfectly
 expressed in ambiguous contract language"). Wyman attached
 affidavits to its opposition to summary judgment from the
 attorneys who had represented it during the partnership
 negotiations. Because we do not consider this evidence, we do
 not describe the contents of the affidavits.
 The district court decided against IBM's motion for
 summary judgment. It construed the contract's language as
 unambiguously supporting Wyman's position. The district court
 did not detect any ambiguity in the terms of the contract
 requiring resort to parol evidence, as Wyman had argued. 
 Although Wyman had not moved for summary judgment, the district
 court granted summary judgment sua sponte for Wyman, reasoning
 that IBM's own motion for summary judgment had given it a fair
 opportunity to put forward its own interpretation of the
 contract's terms.
 IBM appeals, again arguing that the contract is
 unambiguous and supports its position. In the alternative, IBM
 argues that the district court's sua sponte grant of summary
 judgment was improper and that a remand for further fact-
 finding is appropriate if we should think the contract
 ambiguous. We reject both contentions.
 II.
 Our review of the district court's grant of summary
 judgment is de novo. Sears, Roebuck & Co. v. Goldstone &
 Sudalter, P.C., 128 F.3d 10, 15 (1st Cir. 1997). Further,
 "[u]nder Massachusetts law, interpretation of a contract is
 ordinarily a question of law for the court," Coll v. PB
 Diagnostic Systems, Inc., 50 F.3d 1115, 1122 (1st Cir. 1995)
 (internal quotation marks and citations omitted) and, as a
 question of law, is subject to plenary review. "Should the
 court find the contract language unambiguous, we interpret it
 according to its plain terms." Den Norske Bank, 75 F.3d at 52. 
 If those plain terms unambiguously favor either side, summary
 judgment is appropriate. On the other hand, if the contract's
 terms are ambiguous, "contract meaning normally becomes a
 matter for the factfinder," id., and summary judgment is
 appropriate only if "the extrinsic evidence presented about the
 parties' intended meaning is so one-sided that no reasonable
 person could decide to the contrary." Id. at 53 (citations,
 internal quotation marks and alterations omitted).
 The difference in these standards is a result of the
 parol evidence rule, which Massachusetts follows. In
 Massachusetts, "[t]he parol evidence rule precludes evidence of
 earlier or contemporaneous discussions that would modify the
 provisions of a later integrated agreement which the proponent
 of the agreement seeks to enforce." New England Fin.
 Resources, Inc. v. Coulouras, 566 N.E.2d 1136, 1139 (Mass. App.
 Ct. 1991). Both parties concede that the partnership agreement
 by its own terms is a fully integrated document and that it
 represents the whole understanding of the parties, and so, if
 unambiguous, cannot be modified by evidence of earlier or
 contemporaneous discussions. The question of whether an
 ambiguity exists in such an agreement is also "generally a
 matter of law for the court." Wyner v. North Am. Specialty
 Ins. Co., 78 F.3d 752, 754 (1st Cir. 1996). "An ambiguity is
 not created simply because a controversy exists between the
 parties, each favoring an interpretation contrary to the
 other's." Id. at 756 (internal quotation marks and citation
 omitted). Rather, a contract is only ambiguous "where an
 agreement's terms are inconsistent on their face or where the
 phraseology can support reasonable differences of opinion as to
 the meaning of the words employed and obligations undertaken." 
 Coll, 50 F.3d at 1122 (internal quotation marks, alterations
 and citation omitted). 
 With these principles in mind, we turn to the
 question posed in this case. Under the settlement agreement,
 the question posed to the court, well within our Article III
 jurisdiction, is this:
 In any proposal for refinancing the
 Partnership debt involving the purchase of
 the outstanding first mortgage note, does
 the Partnership Agreement require, unless
 otherwise requested by the Managing
 Partner, that IBM first make a capital
 contribution in an amount necessary to
 achieve Adjusted Capital Contribution
 Balance (approximately $17.5 million) and,
 then, that the Partnership finances the
 balance needed to refinance the debt in
 accordance with the terms of the
 Partnership Agreement?
 
 To answer this question, we turn to the terms of the
 Partnership Agreement, which sets forth a complex financial
 relationship between the parties.
 According to 3.1 of the Agreement, Wyman initially
 held a 51% interest in the partnership, while IBM was given a
 49% interest. Pursuant to 3.2, Wyman's initial capital
 contribution was real property, valued by the Agreement at
 $19.3 million, while IBM's initial capital contribution was
 merely $1 million in cash. Thus, each partner's initial
 capital contribution did not reflect that partner's respective
 ownership interest in the partnership on a pro rata basis.
 The Agreement imposes different obligations on the
 parties that are contingent on whether "Adjusted Capital
 Contribution Balance" has been achieved. According to 
 1.1(4), "'Adjusted Capital Contribution Balance' shall mean the
 initial point at which the Adjusted Capital Contributions of
 Wyman and IBM are in a 51:49 ratio," i.e. the point at which
 the two partners' adjusted capital contributions reflect each
 partner's ownership interest in the partnership in that ratio.
 Section 1.1(3) defines "Adjusted Capital
 Contribution" as follows:
 "Adjusted Capital Contribution" shall mean
 the initial Capital Contribution of a
 Partner, increased by any subsequent
 Capital Contributions and reduced by any
 Capital Proceeds distributed to such
 Partner under Section 4A.2, Second and
 Fourth.
 
 The Agreement's definition of "Adjusted Capital Contribution"
 makes clear that there are two primary ways in which Adjusted
 Capital Contribution Balance might be achieved. If the project
 generates sufficient revenue to allow for the distribution of
 capital proceeds to the partners, 4A.2 sets forth the way in
 which such proceeds are to be distributed:
 First, to Wyman, until Adjusted
 Capital Contribution Balance has been
 achieved, an amount equal to 6.5% per year
 of the difference from time to time
 between Wyman's Adjusted Capital
 Contribution and IBM's Adjusted Capital
 Contribution . . . .
 Second, to Wyman, until Adjusted
 Capital Contribution Balance.
 Third, to pay the unpaid outstanding
 balances if any, of loans made by any
 Partner . . . to the Partnership . . .
 plus any accrued but unpaid interest
 thereon.
 Fourth, the balance in accordance
 with the Distributive Shares of the
 Partners . . . .
 
 Thus, one method by which Adjusted Capital Contribution Balance
 could be achieved, contingent on the project generating
 sufficient revenue, would be for the partnership to repay Wyman 
 for its initial capital contribution of $19.3 million from the
 capital proceeds of the project until a 51:49 ratio was met. 
 That would require, assuming no additional capital
 contributions from either party, the partnership to distribute
 approximately $18.3 million to Wyman under 4A.2 Second. That
 $18.3 million distribution would be, of course, over and above
 any distributions required to compensate Wyman at the rate of
 6.5% annually for the partnership's use of Wyman's surplus
 capital contribution pursuant to 4A.2 First. Only after such
 distributions have been made (and any loans have been repaid)
 would the partnership begin making payments of any capital
 proceeds to the partners in accordance with each partner's
 ownership interest.
 The Agreement also contemplates another method by
 which Adjusted Capital Contribution Balance might be achieved. 
 According to 3.2(c), governing "Additional Capital
 Contributions by IBM":
 If the Partnership requires additional
 funds for any purpose . . . at any time
 before Adjusted Capital Contribution
 Balance occurs, IBM upon notice from the
 Managing Partner shall promptly contribute
 the amount required (but not more than
 such amount as is required to effect
 Adjusted Capital Contribution Balance) and
 Wyman shall not be required to contribute
 any funds until Adjusted Capital
 Contribution Balance occurs. . . .
 
 Thus, if the partnership "require[d] additional funds for any
 purpose," Wyman could call on its partner, IBM, to make
 additional capital contributions up to the amount required to
 achieve balance. This required IBM potentially to make
 additional capital contributions of up to approximately $17.5
 million. There is no mention in 3.2(c) of any duty first to
 seek money from outside lenders.
 Thus, the agreement contemplated that the initial
 imbalance of the two partners' capital contributions could be
 addressed either by a payment from the partnership to Wyman
 totaling approximately $18.3 million (above the 6.5% annual
 charge on the use of Wyman's excess capital) if capital
 proceeds were forthcoming, or by additional capital
 contributions from IBM potentially totaling approximately $17.5
 million, if additional capital contributions were required, or
 by some combination of the two.
 Once Adjusted Capital Contribution Balance occurs,
 however, the parties' obligations to make capital contributions
 change. Pursuant to 3.3.1, entitled "need for funds":
 After Adjusted Capital Contribution
 Balance is achieved, if the Partnership
 requires additional funds for any purpose
 . . . at any time in excess of the amounts
 available under the Construction Loan or
 Permanent Loan, the Managing Partner 
 shall first attempt to arrange for the
 borrowing of such funds from independent
 lenders, or from a Partner or its
 Affiliate or Related Person, on such terms
 as are Approved by the Partners. . . . If
 the Partnership does not agree to borrow
 such funds, the Partners shall make
 additional Capital Contributions from time
 to time in accordance with the provisions
 herein and in the same percentages as
 their then respective aggregate
 Distributive Shares and in such amounts
 which are sufficient to enable the
 Partnership to carry out the purposes of
 this Agreement. . . . 
 Thus, after Adjusted Capital Contribution Balance is achieved,
 3.3.1 imposes a duty on the partnership first to seek funds
 by borrowing from third-party lenders. If such borrowing is
 insufficient to supply funds that "the Partnership requires for
 any purpose," the partnership may then call on the partners to
 make additional capital contributions "in the same percentages
 as their then respective aggregate Distributive Shares . . . ." 
 Thus, if balance had been achieved and additional funds were
 needed above what was available from lenders, the partnership
 could call on Wyman to contribute 51% of the amount required
 and IBM to contribute the remaining 49%.
 Wyman's interpretation of the Agreement is relatively
 straightforward. Under 3.2(c), Wyman is given a right to
 make a capital call on IBM, if the partnership "requires
 additional funds for any purpose," up to the amount needed to
 achieve Adjusted Capital Contribution Balance, i.e.,
 approximately $17.5 million. Under 3.2(c), Wyman need make
 no additional contributions nor seek outside debt financing. 
 Because a refinancing of the original loan is a valid
 "purpose," this permits Wyman to call on IBM to make such an
 additional capital contribution before seeking outside debt
 financing so long as the parties' capital contributions remain
 out of balance. Under 3.3, it is only after balance is
 achieved that Wyman has any obligation first to seek outside
 debt financing.
 IBM acknowledges its basic obligation to make
 additional capital contributions, potentially totaling $17.5
 million, under 3.2(c) if the partnership "requires additional
 funds for any purpose." IBM also acknowledges that "any
 purpose" includes the purpose of refinancing the initial
 permanent loan. Finally, IBM also acknowledges that,
 generally, Wyman need not seek outside debt financing before it
 calls on IBM to make additional capital contributions before
 balance occurs under 3.2(c), but only after balance occurs,
 in accordance with 3.3. However, IBM argues that a
 refinancing of the permanent loan that provided the initial
 financing for the project represents an exception to the
 general terms of 3.2(c).
 IBM notes the longstanding principle of contract
 interpretation that "[s]pecific terms are given greater weight
 than general language." In re 604 Columbus Ave. Realty Trust,
 968 F.2d 1332, 1357 (1st Cir. 1992) (citing Lembo v. Waters,
 294 N.E.2d 566, 569 (Mass. App. Ct. 1973)). IBM argues that
 contract provisions specifically addressed to the permanent
 loan, rather than the general capital contribution provisions
 in 3.2(c) and 3.3, should govern. IBM notes that the
 cornerstone of the project's initial financing is a $75 million
 non-recourse note secured by a mortgage on the office building. 
 Section 3.9.2 specifies how the partnership would obtain this
 loan:
 The Partnership shall attempt to secure
 financing by a lender or lenders which (a)
 provides for a non-participating Permanent
 Loan to the Partnership on terms and
 conditions Approved by the Partners, in an
 amount not less than the greater of (i)
 $75,000,000 and (ii) 100% of the then
 current estimate of Total Project Costs
 (all of which are to be paid or reimbursed
 with the proceeds of the Permanent Loan),
 and so far in excess of the greater of
 such figures as is appropriate in light of
 required debt service thereon, other
 anticipated Partnership expenses, and
 anticipated Partnership income and (b)
 provides for the exculpation of the 
 Partnership and its Partners from all
 personal liability for the payment of any
 interest on, or principal of, the
 Permanent Loan or the performance of any
 of the terms and conditions contained in
 any mortgage, deed of trust or other
 security instruments securing the
 Permanent Loan or in any collateral
 document except insofar as the Partners
 may be required to obligate themselves
 personally to provide such funds as may be
 required to obtain a Permanent Loan of at
 least $75,000,000. . . . 
 
 Thus, IBM says, 3.3.2 provides that the partnership's
 "Permanent Loan," which was expected to provide the financing
 for virtually all the partnership's expenses, should be non-
 recourse to the extent possible, and specifically provides that
 the loan should not require either partner to personally
 indemnify the loan unless and only to the extent necessary to
 obtain the loan.
 Indeed, the $75 million figure, IBM argues further,
 was intended to provide the partnership not only with
 sufficient funds to pay for the operation of the project but
 also to repay Wyman for its disproportionate capital
 contribution. IBM contends that this reliance on debt
 financing by both parties represents, from its perspective, the
 linchpin of the deal; both parties would provide little equity
 financing, and the partnership's major financing would be a
 non-recourse loan secured by a mortgage on the office building
 itself. To obtain such a loan, IBM further notes, IBM was
 required to enter a long-term lease for over half of the office
 building, thus satisfying the lender that the office building
 would have at the outset an anchor tenant of the stability of
 a blue-chip corporation like IBM. This in turn created the
 risk for IBM that it would be locked into a unfavorable lease
 for office space. IBM finally argues that there is no textual
 conflict between 3.9.2 and 3.2(c) because the word
 "requires" in 3.2(c) should be interpreted in the refinancing
 context as incorporating a duty first to seek outside debt
 financing.
 The two parties' differing interpretations thus
 depend on which provisions of the contract govern IBM's
 undisputed obligation to provide capital contributions in any
 refinancing of the permanent loan. Wyman argues that the
 general capital contribution obligations set forth in 3.2(c)
 and 3.3.1 govern. According to those provisions, Wyman is
 permitted under 3.2(c) to call on IBM to make additional
 capital contributions "[i]f the Partnership requires additional
 funds for any purpose" up to the amount needed to achieve
 Adjusted Capital Contribution Balance. Section 3.2(c) imposes
 no duty first to seek debt financing from independent lenders. 
 After balance is achieved, 3.3.1 requires Wyman first to
 attempt to obtain third-party debt financing before calling on
 the partners to make capital contributions that are
 proportional to their ownership interests in the partnership. 
 Again, IBM does not dispute its obligation to provide capital
 contributions in a refinancing, but rather argues that the
 permanent loan provision, 3.9.2, demonstrates the parties'
 intent to rely primarily on debt financing, and that the
 provisions of 3.9.2 thus limit IBM's general obligations to
 provide additional capital contributions under 3.2(c).
 Without more, the contrast between 3.9.2's reliance
 on debt financing for the permanent loan and the clear language
 of 3.2(c) and 3.3.1 outlining IBM's capital contribution
 obligations might create sufficient ambiguity to require going
 outside the contract's "four corners" to determine the parties'
 true intent concerning IBM's capital contribution obligations
 in any refinancing. See Den Norske Bank, 75 F.3d at 52. Such
 extrinsic evidence would allow the court to determine whether
 the parties intended to make the achievement of Adjusted
 Capital Contribution Balance an overriding objective, as Wyman
 maintains, or whether any such goal was subordinate to the
 partnership's reliance on debt financing, as IBM contends.
 However, resort to extrinsic evidence is not
 necessary because the contract itself provides an unambiguous
 answer to the question of which provision governs the parties'
 obligations in a refinancing. Exhibit D of the Agreement lays
 out the partnership procedure for undertaking "Major
 Decisions." One such decision is any refinancing of the
 permanent loan. Exhibit D, C(13) describes the parties'
 obligations to each other in any refinancing of the permanent
 loan. That provision expressly provides that "the need for
 capital contributions shall be determined in accordance with
 Section 3.3 of the Agreement." Notably, Exh. D, C(13) does
 not refer to 3.9.2, but expressly states that 3.3 governs
 the need for capital contributions in the refinancing context.
 Section 3.3, in turn, lays out each partner's capital
 contribution obligations "[a]fter Adjusted Capital Contribution
 Balance [has been] achieved . . . ." Because balance has not
 yet been achieved, under 3.3 we must look to 3.2(c) to
 determine the parties' obligations. That section, in turn,
 provides that IBM has an obligation to provide up to the amount
 required to achieve balance (approximately $17.5 million) "[i]f
 the Partnership requires additional funds for any purpose
 . . . ."
 The use of the words "for any purpose" clearly lays
 out a very broad obligation to provide additional capital
 contributions to the Partnership. We do not agree with IBM's
 argument that the word "requires" limits this obligation to
 providing additional capital contributions only if financing
 cannot be obtained from third-party lenders. Such an
 interpretation of "requires" would import the obligation to
 seek debt financing contained in 3.3.1, operative only after
 balance is achieved, into 3.2(c), operative before balance
 is achieved. Section 3.2(c) contains no express obligation to
 seek funding first from outside lenders, and this is plainly
 not accidental. To interpret 3.2(c) as implicitly containing
 such an obligation would contradict the parties' expressed
 intent to provide for different capital contribution
 obligations depending on whether the parties' adjusted capital
 contributions had achieved balance or not.
 IBM's proposed interpretation of "requires" in 
 3.2(c) as incorporating a duty to seek debt financing in the
 refinancing context also creates linguistic problems, by
 creating a redundancy. Both 3.2(c) and 3.3.1 limit the
 parties' obligations to provide additional capital
 contributions to circumstances in which the partnership
 "requires additional funds for any purpose . . . ." If the
 word "requires" already incorporates a duty first to seek debt
 financing in any refinancing, it would eliminate the reason for
 the express language in 3.3.1 which imposes on the
 partnership, after balance is achieved, an obligation first to
 seek debt financing before calling on the partners to
 contribute additional capital. A contract should be
 interpreted as a whole, so that each of its provisions has
 operative effect. See Bank One Texas, N.A. v. A.J. Warehouse,
 Inc., 968 F.2d 94, 97-98 (1st Cir. 1992); J.A. Sullivan Corp.v. Commonwealth, 494 N.E.2d 374, 378 (Mass. 1986). IBM
 essentially argues that the word "requires" in 3.2(c)
 implicitly imposes a duty to seek debt financing identical to
 the duty expressly imposed by 3.3.1. Such an interpretation
 does not square with the identical use of the word "requires"
 in 3.3.1.
 IBM notes that Exh. D, C(13) refers expressly to
 3.3, but not to 3.2(c). IBM construes this omission to
 express an intent to impose the duty to seek third-party debt
 financing contained in 3.3 in all refinancing proposals,
 regardless of whether Adjusted Capital Contribution Balance had
 been achieved. Otherwise, IBM argues, Exh. D., C(13) would
 expressly refer to both 3.2(c) and 3.3. The difficulty with
 this argument is that it requires us to ignore the text of 
 3.3, which expressly applies only "[a]fter Adjusted Capital
 Contribution Balance [has been] achieved . . . ." Although an
 express reference to both 3.2(c) and 3.3 might have been
 more artful drafting, the reference to 3.3 alone is
 sufficient to lead the reader from 3.3 to 3.2(c). Section
 3.3 is applicable only after balance is achieved; 3.2(c)
 explains how the partnership can call for capital contributions
 before balance is achieved.
 IBM's next argument for imposing a duty on the
 partnership to seek outside debt financing is based on the
 definition of "Permanent Loan," which the Agreement defines as
 "such long term financings or refinancings, whether one or
 more, which are described in Subsection 3.9.2." Agreement 
 1.1(50). This definitional provision is too thin a reed on
 which to rely, given the statement in Exh. D, C(13),
 governing any proposal for refinancing, that "the need for
 capital contributions shall be determined in accordance with
 Section 3.3 of the Agreement." 
 Of course, the definitional provision, 1.1(50),
 states that the provisions of 3.9.2 generally apply to both
 the initial financing and to any refinancing proposal. Yet the
 provisions of 3.9.2 are drafted with the initial permanent
 loan in mind, and not all of them make sense as applied to a
 refinancing. For example, 3.9.2 instructs the parties to
 obtain a loan of at least $75 million, but a refinancing,
 obtained after some of the principal of the initial loan had
 been paid and perhaps on more favorable terms, would likely
 involve a loan for a smaller amount (as it did here). IBM does
 not argue that 3.9.2 imposes an obligation in any refinancing
 proposal to maintain indebtedness of at least $75 million. 
 Rather it admits that 3.9.2 does not apply "to its full,
 literal extent" in the refinancing context, and given that the
 provision's terms were apparently drafted with the initial
 permanent loan in mind, we are inclined to agree.
 Moreover, the question in this case concerns capital
 contribution obligations, a topic not directly addressed by 
 3.9.2. Exh. D, C(13) provides expressly that in any
 refinancing the "need for additional capital contributions" is
 governed by the general provisions of the Agreement concerning
 such contributions, i.e. 3.3 and 3.2(c) (by implicit
 reference), not by any allegedly different rules created by 
 3.9.2. Therefore, whatever relevance the requirements of 
 3.9.2 have to a refinancing plan in general, it is plain that
 3.3, and therefore 3.2(c), govern the parties' obligations
 to provide additional capital contributions as part of any
 refinancing. Those provisions impose a duty first to seek
 outside debt financing only after Adjusted Capital Contribution
 Balance is achieved.
 IBM's final objection is that an interpretation which
 permits the partnership to require an additional capital
 contribution of up to $17.5 million in any refinancing would
 render the contract irrational. Under Massachusetts law, "a
 contract should be construed so as to give it effect as a
 rational business instrument." McMahon v. Monarch Life Ins.
 Co., 186 N.E.2d 827, 830 (Mass. 1962). IBM poses various
 hypothetical scenarios designed to show that allowing Wyman to
 trigger a large capital contribution obligation, potentially
 totalling $17.5 million, simply by proposing a refinancing plan
 renders the deal's reliance on debt financing meaningless. 
 This, IBM contends, could not represent the reasonable
 expectations of the parties. See id.
 IBM's parade of horribles ignores the important
 safeguards against such overreaching which the Agreement itself
 incorporates. First, as to the initial financing, 3.9.2
 requires the partnership to seek a loan "in an amount not less
 than the greater of (i) $75,000,000 and (ii) 100% of the then
 current estimate of Total Project Costs . . . ." This
 provision thus requires the partnership to seek an initial loan
 that is at least large enough to cover all of the partnership's
 needs, and in no event less than $75 million. Under 3.9.2,
 then, IBM would not be required to make any additional capital
 contribution at the time of the initial financing plan unless
 the partnership fell short of its borrowing goals.
 Second, as to any refinancing plan (in which, as IBM
 acknowledges, the requirement to maintain the same level of
 indebtedness would not apply), it is true that IBM could be
 required to make an additional capital contribution,
 potentially totaling $17.5 million, so long as Adjusted Capital
 Contribution Balance had not been achieved. Yet this does not
 leave IBM without recourse. Under Exh. D, C(13), any
 refinancing proposal is a "Major Decision." Although the
 Agreement does not give IBM the power to veto a refinancing
 proposal, as it does with some other decisions, IBM can demand
 arbitration of any refinancing proposal under Article XI of the
 Agreement. That provision requires a neutral set of arbiters,
 experienced in the Boston real estate market, to consider the
 commercial reasonableness of any refinancing proposal. If
 Wyman proposed a refinancing plan which was not in the
 partnership's best interests but was merely a pretext to force
 IBM to make a capital contribution, then IBM could challenge
 the refinancing proposal itself before the arbitration panel. 
 These safeguards would prevent Wyman from abusing its
 power as Managing Partner under 3.2(c) to call on IBM to make
 additional capital contributions in any refinancing proposal. 
 They do not, however, limit the partnership's ability to call
 on IBM to make additional capital contributions in an otherwise
 reasonable refinancing plan. Giving Wyman such authority is
 not so commercially irrational that it would cause us to
 question our interpretation of these unqualified and
 unambiguous provisions requiring IBM to make a capital
 contribution as part of a commercially reasonable refinancing
 proposal. Wyman may well have decided to agree to a
 partnership in which IBM's initial capital contribution was
 small only because it had the broad authority under 3.2(c)
 to call on IBM to make additional capital contributions that
 were appropriate for the partnership's needs. The text of the
 Agreement makes clear that this authority was not circumscribed
 by a duty to seek outside debt financing first in any
 refinancing arrangement. It is not for the courts to upset the
 deal that the parties have made.
 We therefore conclude, as did the district court,
 that the Agreement's text provides an unambiguous answer to the
 question the parties have posed in this declaratory judgment
 action. In any proposal for refinancing the Partnership debt
 involving the purchase of the outstanding first mortgage note,
 the Partnership Agreement requires, unless otherwise requested
 by the Managing Partner, that IBM first make a capital
 contribution in an amount necessary to achieve Adjusted Capital
 Contribution Balance (approximately $17.5 million) and, then,
 that the Partnership finance the balance needed to refinance
 the debt in accordance with the terms of the Partnership
 Agreement.
 One final issue remains. This case was not resolved
 on cross-motions for summary judgment; rather, Wyman opposed
 IBM's motion for summary judgment on the ground that the
 contract was ambiguous, that discovery was needed to ascertain
 the true intent of the parties through resort to parol
 evidence, and that summary judgment was therefore premature.
 The touchstone in our review of the district court's
 decision to grant Wyman summary judgment sua sponte is whether
 IBM was afforded appropriate notice and a fair opportunity to
 present its arguments. See Berkovitz v. Home Box Office, Inc.,
 89 F.3d 24, 29 (1st Cir. 1996). Sua sponte summary judgment
 is also appropriate only if the litigation is sufficiently
 advanced that both parties have had a reasonable opportunity
 to present any material evidence in their favor. See id.
 If the district court had ruled for Wyman on the
 ground that the agreement was ambiguous and that parol evidence
 demonstrated that Wyman's position was correct, we would in all
 likelihood agree with IBM. As Wyman had argued that more
 discovery was necessary, such a ruling would have presented
 serious problems of unfair surprise to IBM, which was entitled
 to develop parol evidence of its own if it failed to convince
 the court on its purely textual argument and would have had no
 opportunity to request additional discovery under Fed. R. Civ.
 P. 56(f). But the district court ruled that the agreement was
 unambiguous and that it supported Wyman's position. This court
 has affirmed the decision of the district court on the same
 basis.
 IBM's motion for summary judgment in its favor was
 premised on a theory that the contract was unambiguous and
 supported its position. IBM's own summary judgment motion, in
 the circumstances of this case, gave IBM ample opportunity to
 explain its understanding of the contract terms and to set
 forth its interpretation of the contract's text. As neither
 the district court nor this court considered resort to
 extrinsic evidence necessary, no further discovery was
 warranted. We therefore find no error, given the circumstances
 of this case, in the district court's sua sponte grant of
 summary judgment.
 We make one final observation. Both sides have been
 served well by very able counsel. Further, the efforts of
 counsel to resolve this matter, or so much of it as they were
 able, are to be commended. Through the settlement, in a very
 real sense, both sides have won.
 The judgment of the district court is affirmed.